[L. A. No. 2519.   In Bank.—June 2, 1911.]

## GUSTAVE BRENNER, Respondent, v. CITY OF LOS ANGELES (a Municipal Corporation), Appellant.

TAXATION—ASSESSMENT OF REAL PROPERTY—DEDUCTION OF VALUE OF MORTGAGE—PRESUMPTION OF PERFORMANCE OF OFFICIAL DUTY.—In the absence of any request for a statement of his taxable property, a mortgagor of real property has the right to assume that the assessor, in assessing the mortgaged property for purposes of taxation, had properly performed his official duty and had deducted the value of the recorded mortgage from the assessed valuation of the property.

ID.—TAXES PAID UNDER PROTEST—PROPERTY NOT LIABLE TO ASSESSMENT—FAILURE TO DEMAND CORRECTION OF ASSESSMENT.—Money paid under protest for taxes on property not liable to assessment may be recovered, notwithstanding no application is made for correction of the assessor's error before the period of equalization fixed by law has passed. (*Henne* v. *County of Los Angeles,* 129 Cal. 297, overruled.)

ID.—ACTION MAY BE MAINTAINED AFTER EXPIRATION OF PERIOD FOR EQUALIZATION.—The remedy provided by section 3819 of the Political Code, of suing to recover void taxes paid under protest, is not limited, in its application, either by its language or by other statutes, to cases in which the taxpayer wishing to avail himself of it has vainly applied for relief before the assessor has closed his books and before the board of equalization has adjourned.

ID.—FAILURE TO DEDUCT MORTGAGE TO REGENTS OF UNIVERSITY—CITY TAXES OF LOS ANGELES—PAYMENT OF EXCESS UNDER PROTEST.—In the absence of any request for a statement of his taxable property, a mortgagor of real property, which is subject to a recorded mortgage held by the regents of the University of California, and which is assessed against him for city taxes of the city of Los Angeles at its full value, without any deduction on account of the mortgage, is entitled, under section 63 of the ordinance of the city of Los Angeles, providing for the assessment and collection of city taxes, to recover the excess taxes levied on the value of the mortgage which had been paid by him under protest, upon presenting a verified claim therefor to the city council within six months after the payment. Such excess taxes are taxes "erroneously or illegally collected," within the meaning of such section of the ordinance.

APPEAL from a judgment of the Superior Court of Los Angeles County.   George H. Hutton, Judge.

The facts are stated in the opinion of the court.

Leslie R. Hewitt, City Attorney, and Emmet H. Wilson, Chief Deputy, for Appellant.

Denis & Loewenthal, for Respondent.

MELVIN, J.—Plaintiff sued to recover certain taxes paid under protest to the city of Los Angeles. A general demurrer to his complaint was overruled and defendant declining to answer, judgment by default was rendered in favor of the plaintiff. From said judgment the city of Los Angeles prosecutes this appeal.

The complaint is drafted in two counts both based on sections of an ordinance of the city of Los Angeles providing for the assessment and collection of city taxes and the said ordinance is fully set forth in the complaint. The essential facts disclosed by the complaint are that on the first day of March, 1906, plaintiff was the owner of certain real property in the city of Los Angeles upon which a recorded mortgage for sixty thousand dollars was held by the regents of the University of California. No part of this mortgage had been paid. The assessor in making his assessment for the year 1906 placed the valuation of the property of plaintiff at eighty-two thousand dollars and failed to deduct sixty thousand dollars for the mortgage although he had done so in his assessment of the year before. The ordinance provided that the city might exact from each taxpayer a statement under oath setting forth under appropriate headings his various kinds of property and the complaint contained an averment that no demand had been made upon plaintiff at any time by the city assessor of the city of Los Angeles for such declaration of his taxable possessions. There is also an allegation that not until May 28, 1907, did the plaintiff know that the assessor had failed to deduct sixty thousand dollars from the total assessable value of his land. Then follow averments that the taxes were paid under protest on June 28, 1907; that on the same day plaintiff filed with the city council of Los Angeles a petition asking for a return of the portion of the said taxes improperly assessed against him; that on December 27, 1907, he filed with said city council a duly verified claim for the return to him of said

taxes so erroneously charged against him; and that the city
council refused such repayment. The second count contains
all matters set forth in the first one and the additional allega-
tion that the tax-collector of the city of Los Angeles had
erroneously and illegally collected from plaintiff the amount
of taxes and penalties properly chargable against the mortgage
held by the regents of the University of California.

Appellant's attorneys rely upon the authority of *Henne* v.
*County of Los Angeles,* 129 Cal. 297, [61 Pac. 1081], in which
it was held that certain taxes paid under protest upon an
assessment similar to the one here considered could not be
recovered because steps for their repayment had not been
taken by the taxpayer within the time provided by law. In
that case, as here, the mortgage was held by the regents of the
University of California as mortgagees and no part of it had
been paid, yet the county assessor had placed a valuation upon
the realty covered by the mortgage without reference to the
security which, under the constitution (art. XIII, sec. 4), was
to be assessed to the owner thereof. The assessment was made
March 1, 1898. On July 23, 1898, plaintiff, Henne, demanded
that the assessor correct the assessment by deducting the
amount of the mortgage. The assessor refused to comply with
this demand. On November 23, 1898, plaintiff filed a verified
petition asking the board of supervisors to refund the portion
of the taxes which had been levied on the mortgage, and, this
petition having been subsequently denied, the plaintiff paid
the full amount of the taxes under protest. The reasoning
of the court in that case in upholding the action of the assessor
and the board of supervisors was based upon the fact that the
taxpayer made application to the former for relief after the
assessor's books had been closed and a statement of his year's
work had been transmitted to the state board of equalization
and that the board of supervisors had fully performed their
duty of equalization according to the statute and had sent
the completed assessment to the auditor before they were
asked to refund the excessive amount paid for taxes. Assum-
ing that the taxpayer had full notice of the assessor's alleged
mistake (and there was nothing in the pleadings to the con-
trary), the court held that he had failed to avail himself
seasonably of the remedies provided by law. The last sentence
of the opinion indicates the rationale of the decision. It is as

follows: "It was the fault of the plaintiff himself in this case that he did not obtain relief by one or the other of the modes indicated, inasmuch as his application was too late in both cases."

Respondent's counsel point out several differences between the case of *Henne* v. *County of Los Angeles*, 129 Cal. 297, [61 Pac. 1081], and the case at bar. In the former case, as the opinion indicated, there was insufficient allegation with reference to the over-valuation of plaintiff's interest by the assessor. The court said: "The value of the property, aside from the assessment, is not stated in the complaint, and for aught that appears, the assessment may have been for the value of such property over the amount of the mortgage." In the case before us there was not only the averment in the complaint that the assessor failed to deduct the amount of the mortgage, but there was the statement also that eighty-two thousand dollars was the full value of the property at the date of the assessment. Another difference between this and the Henne case is that in the latter it did not appear whether or not the assessor demanded a statement from the taxpayer, while in the case at bar there was an allegation that no statement had ever been required of plaintiff. In the Henne case the court said: "There is no averment in the complaint that the assessor failed to make a demand on the plaintiff as a taxpayer for a statement of his property as required by law, nor is there any averment that the plaintiff as a taxpayer made and delivered to the said assessor a statement under oath." In the Henne case it affirmatively appears that the plaintiff therein, after his demand on the assessor on July 23, 1898, waited until November 3d before seeking aid from the supervisors and that, therefore, there was probably time, after the discovery of the assessment of the property to himself without deduction for the mortgage, in which he might have brought his grievance before the board of supervisors sitting as a board of equalization. Here it appears that Brenner had no notice of the assessor's error until long after the possibility of seeking relief from the board of equalization had passed. In the absence of any request for a statement of his taxable property he had the right to assume that the assessor had properly performed his official duty and had deducted the value of the recorded mortgage from the assessed valuation of plaintiff's property.

Another marked difference between the two cases is that in
*Henne* v. *County of Los Angeles* the court treated the applica-
tion as one made under the provisions of section 3819 of the
Political Code, and even if we should regard that case as
authority against the plaintiff's claim as set forth in his first
count in the case now before us, we would still have to examine
the second count which is based upon section 63 of the
ordinance attached to the complaint. But we are of the
opinion that, in so far as *Henne* v. *County of Los Angeles*
places in the same category the mere over-valuation of property
in an assessment thereof, and the inclusion in such an assess-
ment of property not taxable at all, that case should be over-
ruled. The case was properly decided because the record
failed to show that the property was not assessed for its value
"over the amount of the mortgage;" but we think it is time
to renounce the doctrine that money paid under protest for
taxes on property not liable to assessment cannot be recovered
unless application is made for correction of the assessor's error
before the period of equalization fixed by law has passed.
We think that perhaps the court in the Henne case adopted
some language from the opinion of the supreme court of
Massachusetts without a sufficient examination of the law of
that state. The case was *Osborn* v. *Inhabitants of Danvers,*
6 Pick. (Mass.) 98. Plaintiff had properly submitted to the
assessors a list of his possessions, but before acting, the
assessors added items of property situated in another state.
The court declined to decide the question as to the validity
of the taxes but decided against the plaintiff strictly in accord-
ance with the peculiar statute of Massachusetts. This language
is used in the opinion:

"The remedy, and the only remedy, for an over-valuation
and assessment is under the statute of 1785, c. 50, sec. 10, by
which it is provided, that whenever any person shall be
aggrieved by being overrated in the assessment of any tax, he
may apply to the assessors to make a reasonable abatement;
and if they refuse so to do, complaint is to be made, in nature
of an appeal, to the court of general sessions of the peace, who
are authorized to relieve him. This is an adequate and con-
venient remedy; but great mischiefs would follow, if we were
to hold that an excess of valuation would render an assess-
ment illegal and void. And it is immaterial whether the excess

is caused by including in the valuation, property of which the person taxed is not the owner, or that for which he is not liable to be taxed. In both cases the remedy is the same. As the plaintiff is liable to taxation for his personal property, the assessment was valid, although he was assessed for more than his due proportion. His only remedy is by application for an abatement; for when a new right is created by statute, which at the same time provides a remedy for any infringement of it, that remedy must be pursued."

The latter part of the quotation beginning with the words "but great mischiefs" was adopted in the Henne case, but the language preceding it shows that the real basis of the decision was the exclusive remedy furnished by the statute there considered. Osborn failed to invoke the only remedy given him by law within the time strictly limited in that enactment, while in the case at bar, and in the Henne case, suit was brought in the tribunal having jurisdiction and under the very terms of the statute (Pol. Code, sec. 3819). That section is not limited, in its application, either by its language or by other statutes, to cases in which the taxpayer wishing to avail himself of it has vainly applied for relief before the assessor has closed his books and before the board of equalization has adjourned. That part of the opinion in *Henne* v. *County of Los Angeles*, 129 Cal. 297, [61 Pac. 1081], which seeks to limit a taxpayer in a case like this to the remedies open to him before the assessment has become final by the closing of the assessor's books and by the termination of the period of equalization is overruled.

Returning now to a consideration of section 63 of the ordinance of Los Angeles, we find that this section, which is analogous to section 3804 of the Political Code, provides for the return of taxes "erroneously or illegally collected" upon a verified claim filed within six months after the payment of said taxes. In *Stewart Law & Collection Co.* v. *County of Alameda*, 142 Cal. 660, [76 Pac. 481], it was held that section 3819 of the Political Code did not furnish an exclusive remedy and that section 3804 might be invoked even when the taxes were paid without protest. (See, also, *Lauman* v. *County of Des Moines*, 29 Iowa 310.) The proper application of section 3804 of the Political Code was discussed in *Pacific Coast Company* v. *Wells*, 134 Cal. 471, [66 Pac. 657]. In that case the problem

under consideration was the attempted repayment by the city and county of San Francisco of taxes upon one hundred thousand dollars erroneously levied by reason of a clerical error of plaintiff's bookkeeper which was followed by the assessor. Although the taxes had been voluntarily paid, the board of supervisors, upon presentation of the facts, ordered the restoration of the sum charged against the taxpayer by reason of the erroneous assessment. The auditor refusing to allow the claim thus authorized by the supervisors, this court held that a writ of mandate should issue to compel his obedience to the resolution of the board directing such repayment. This language, which is very pertinent to the problem presented by the case at bar, is used in the opinion: "Petitioner has paid all its just taxes, and this sum in addition. No doubt, if the assessor had called the attention of petitioner to the statement it had given in, the footings would never have been changed. It was a clerical error that could easily have been explained. When the attention of the assessor was called to it, he recommended that the mistake be corrected. The board of supervisors, representing the county, after investigation, made an order to correct it. Shall the city and county keep the $1,625 regardless of all this, It surely would be in violation of honesty and fair dealing for them to do so. Is it in violation of law for them to refund it? We think not. The board was authorized to order the money refunded, under section 3804 of the Political Code, which provides: 'Any taxes, penalties, or costs paid more than once, or erroneously or illegally collected, may, by the order of the board of supervisors, be refunded by the county treasurer.' This being a remedial statute, it should be liberally construed, so as to carry out its intent and object." It is worthy of note that the opinion in *Pacific Coast Company* v. *Wells* is signed by Mr. Justice Van Dyke, the author of the opinion in *Henne* v. *Los Angeles County,* and by Mr. Justice Harrison who concurred in that opinion.

In *Hayes* v. *County of Los Angeles,* 99 Cal. 74, [33 Pac. 766], the plaintiff was seeking to recover the amount of money paid upon a delinquent sale of property which had been doubly assessed, the taxes having been paid by the real owner, and the delinquent sale having followed the supposed default of the person to whom the property had been mistakingly assessed. In that case section 3804 of the Political Code is

thus expounded: "Section 3804 was enacted to do justice in a class of cases where, but for its provisions, the application of the doctrine of *caveat emptor* would work a hardship to citizens who had paid money which it was inequitable for the county to retain. I am of the opinion that the doctrine of *caveat emptor* has no proper application to that class of cases in which the attempted sale of real property for taxes is absolutely void by reason of the tax having been previously paid. This view is sustained by a large number of late authorities, but for present purposes the question is not of moment, the inquiry being directed to plaintiff's right of recovery under the statute. It is urged by respondent that the code, by providing that the board of supervisors *may* by order provide for refunding taxes, etc., paid more than once, made it optional with that body whether to do so or not, and that the board in this instance, having refused to refund, its action is conclusive upon the plaintiff. Where the public interest or private right requires that the thing should be done, then the word 'may' is generally construed to mean the same as 'shall.' (*People* v. *Supervisors,* 68 N. Y. 119.) Where the statute directs the doing of a thing for the sake of justice or the public good, the word 'may' is the same as the word 'shall.' (*Rex* v. *Barlow,* 2 Salk. 609). Where a statute directs a thing to be done for justice's sake *may* means *shall.* (*Silvey* v. *United States,* 7 Court of Claims, 334.) Where persons or the public have an interest in having the act done by a public body, *may* in such a statute means *must.* (*Phelps* v. *Hawley,* 52 N. Y. 27; *People* v. *Supervisors,* 51 N. Y. 401. See *Estate of Ballentine,* 45 Cal. 696.)" See, also, *Palomares Land Co.* v. *County of Los Angeles,* 146 Cal. 537, [80 Pac. 931].)

It seems to us that taxes erroneously collected upon the state's own property which is exempt from taxation fall very properly and logically into the category of those paid because of a double assessment due to the mistake of a public servant. Ever since 1888 when the case of *People ex rel Attorney-General* v. *Board of Supervisors of the City and County of San Francisco,* 77 Cal. 136, [19 Pac. 257], was decided, it has been the settled law that a mortgagor is entitled upon proper application to a return of taxes paid in cases where the assessor has failed to notice a mortgage held by the state. In that case the court said: "But the state should not expect to collect

taxes on her own property,—much less should she expect somebody else to pay them."

By the judgment of the superior court herein the city of Los Angeles lost not a cent of taxes rightfully due upon plaintiff's property, while upon the opposite conclusion, plaintiff would be mulcted, not for taxes due from some one else which through error or carelessness he had paid, but for a charge upon property free from any legitimate assessment by the city at all. In our opinion the plaintiff was entitled to recover the amount found by the court to be due.

The judgment is, therefore, affirmed.

Shaw, J., Angellotti, J., Sloss, J., Lorigan, J., and Henshaw, J., concurred.

---

[Crim. No. 1642. In Bank.—June 2, 1911.]

THE PEOPLE, Respondent, v. GEORGE E. FIGUEROA, Appellant.

CRIMINAL LAW.—MURDER—INTOXICATION OF WITNESS—EVIDENCE—ERROR WITHOUT PREJUDICE.—On a prosecution for murder, a witness who had testified that he saw the defendant, shortly before the homicide, in the possession of a pistol similar to the one found near the body of the deceased, and that during the evening on which he made such observation he had taken a glass of beer, may be cross-examined to show whether or not he had been drinking to excess at that time. A refusal to permit such cross-examination, under the circumstances disclosed by the record, was without prejudice to the defendant.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Frank R. Willis, Judge.

The facts are stated in the opinoin of the court.

Jos. F. Seymour, Jr., and Fred W. Morrison, for Appellant.

U. S. Webb, Attorney-General, for Respondent.

SHAW, J.—The defendant was convicted of the crime of murder of the first degree and sentenced to death. He appeals from the judgment and from the denial of his motion for a new trial.

The defendant was accused of the murder of his wife, Sarah M. Figueroa, on the night of May 22, 1910. The case was submitted on appeal without oral argument on behalf of the defendant or the people, and no briefs have been filed by either party. Notwithstanding this failure of counsel to present the case upon appeal, we have, as is our usual practice in capital cases, carefully read the record and considered the rulings and proceedings upon the trial. The defendant was given a fair trial. The evidence of his guilt was clear and satisfactory. We find but one ruling worthy of notice. It was shown by direct and satisfactory evidence that the defendant shot and killed his wife with a pistol. A witness testified that on the evening before the 22d he saw the defendant and his wife, at their residence, and observed that the defendant had a pistol in his hip pocket, the handle of which was similar to a pistol found near the body of the wife soon after the shooting on the subsequent night. The homicide took place in the residence of the defendant and his wife. On cross-examination this witness stated that he had taken a glass of beer during that evening. He was then asked how many he had taken and whether or not he had been drinking to excess on that night. An objection that this was immaterial and not proper cross-examination was sustained. We think the questions should have been allowed. If the witness had been intoxicated at the time, it would have been for the jury to consider whether his faculties were as clear as if he had been sober, and, whether or not his recollection was correct. But these questions occurred during the course of a long, apparently aimless, and wholly fruitless cross-examination occupying twenty-three pages of the record on appeal. It was obvious from the entire course of the procedure by counsel that he had no knowledge or information that the witness was intoxicated on that occasion. He did not inform the court that he had expected to elicit an admission to that effect, or that he believed or suspected it to be the fact. The witness had been asked minutely as to his doings during that evening prior to his interview with the defendant and there was nothing to indicate that he had been

drinking intoxicants or that he was under the influence thereof. The question was obviously merely one of a large number of questions asked without any object other than a hope of discovering something concerning which counsel had neither information nor knowledge and which it was hoped might discredit or confuse the witness. The fact of the possession of a pistol by Figueroa on the evening before the homicide was not an important part of the case of the prosecution. The proof that he had the pistol and shot his wife with it was not contradicted or impeached in any particular. The circumstances of the cross-examination indicate almost with certainty that the witness would have denied any intoxication. Since counsel did not then suggest the contrary and has not seen fit to pursue the appeal further, we are satisfied that the ruling did not prejudice the defendant in any substantial right.

The judgment and order are affirmed.

Sloss, J., Angellotti, J., Melvin, J., Lorigan, J., and Henshaw, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.

---

[S. F. No. 5711. In Bank.—June 2, 1911.]

LOUIS GASSNER, Appellant, v. P. H. McCARTHY, Mayor of the City and County of San Francisco et al., Respondents.

MUNICIPAL CORPORATION—LIMITATION ON POWERS OF.—A municipal corporation can exercise only such powers as have been conferred upon it by its charter or by some general law.

ID.—SAN FRANCISCO — CONSTRUCTION OF TUNNEL — ASSESSMENT DISTRICT.—The city and county of San Francisco, although it has power, under section 1 of chapter II of article II of its charter, to construct tunnels, has no power to select any limited area of property within its limits, and impose the cost of the construction of the proposed work upon the owners of such property.

ID.—COST OF TUNNEL HOW TO BE PAID.—In the absence of a grant of power to assess the cost of an authorized work upon a special assessment district, the expense of the work must be borne by the municipality as a whole, either out of current revenues or by means of a bond issue.

ID.—CHANGE OF GRADE—NON-CONTIGUOUS BLOCKS—TUNNEL UNDER INTERVENING BLOCKS—ASSESSMENT FOR COST OF WORK.—Chapter VI of article VI of the charter of that city and county, as amended November 23, 1907 (Stats. Sp. Sess. 1907, p. 41), does not authorize a change of the established grade of two non-contiguous blocks of a specified accepted street, the construction of a tunnel under the intervening blocks, the established grade of which remained unchanged, and the assessment of the cost of the work upon a limited assessment district assumed to be benefited thereby. Such a work is not an exercise of the power to "regrade, repave, sewer, sidewalk, curb or otherwise improve the same so as to conform to such change or modified grade," within the meaning of section 1 of that chapter.

ID.—ASSESSMENT DISTRICT FOR COST OF TUNNEL.—Such chapter does not authorize the creation of an assessment district to bear the cost of constructing the tunnel in or under the portion of the street which remains at its old grade.

ID.—COST OF WORK ON ACCEPTED STREETS.—ASSESSMENT TO PROPERTY-OWNERS.—The street upon which such work was proposed to be done being an accepted street, the city and county, under sections 8 and 23 of chapter II of its charter, could not impose the cost of improving it in any way authorized by that chapter, to private property-owners, either according to frontage, or by the special assessment district plan.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James M. Troutt, Judge.

The facts are stated in the opinion of the court.

Olin L. Berry, for Appellant.

Percy V. Long, City Attorney, Jesse H. Steinhart, Assistant City Attorney, and Dorn, Dorn & Savage, *Amici Curiæ*, for Respondents.

SLOSS, J.—The purpose of this action is to test the validity of proceedings instituted by the board of supervisors of the city and county of San Francisco, looking to a change of grade on two blocks of Stockton Street in said city and the construction of a tunnel under two other blocks of said street. The steps

taken provide for the assessment of the cost of the proposed work and the damage to be caused thereby upon a district declared to be specially benefited. The plaintiff, an owner of property fronting on Stockton Street, within the proposed dis- trict, brought this action to enjoin the mayor, the supervisors and other county officers of the city and county from ordering the said proposed work to be done and from taking any further proceedings with reference thereto. A demurrer to the com- plaint was sustained. The plaintiff declined to amend, and judgment was rendered in favor of the defendants. The plain- tiff appeals.

The appellant makes no attack upon the form of the pro- ceedings taken by the board of supervisors or the board of public works. His main contention is that under the charter of the city and county the municipal authorities have no power to assess the cost of the proposed work upon a special assess- ment district. On the other hand, the respondents do not question the appropriateness of the remedy of injunction, if the city be without power to carry out the contemplated scheme.

Stockton Street is a street running north and south. Pro- ceeding southerly, it crosses successively Sacramento, Cali- fornia, Pine, Bush, and Sutter streets. Between these cross- ings there are great variations of grade, the street rising sharply until it reaches its highest point between Pine and California streets, and then descending to Sutter Street. The board of supervisors, upon the recommendation of the board of public works, passed a resolution declaring its intention to change the grade of Stockton Street, between Sacramento and California streets and between Bush and Sutter streets. This was to be done by lowering the grade of Stockton Street at the northerly line of California Street forty-four feet and estab- lishing it at 117 feet above the city base. The grade at the crossing of Sacramento Street was to remain at 128 feet above city base. The grade at the southerly line of Bush Street was to be lowered twenty-four feet and established at eighty-six feet above city base, and at the crossing of Sutter Street was to be left at its existing *status* of seventy-eight feet above city base. It was further declared to be the intention of the board that Stockton Street, between Sacramento and California and between Bush and Sutter streets be graded and changed to

the official grade and that the two said blocks be regraded, repaved, resewered, and residewalked. The doing of this work would have produced two open cuts running into the northerly and southerly sides, respectively, of the Stockton Street hill and separated by a distance of two blocks, i. e., the space between Bush and California streets, and it was proposed to connect these two cuts by a tunnel running through the hill under Stockton Street. The resolution in question, accordingly, declared it to be the intention of the board to order Stockton Street to be improved by constructing a tunnel thereunder, to a width equal to that of Stockton Street, between the southerly line of Bush Street and the northerly line of California Street, the grade of such tunnel to conform to the foregoing changed grade of Stockton Street. It was further declared to be the intention of the board to construct two appropriate stairways in Stockton Street between Sutter Street and Bush Street leading from the level of Stockton Street as changed, to Bush Street, and to construct similar stairways in Stockton Street between California and Sacramento streets. The resolution went on to describe a tract of land constituting a district which was declared to be specially benefited by the proposed work and provided that the actual cost of performing the work and the damages caused thereby should be assessed upon the said district.

The plaintiff is the owner of a lot on the easterly line of Stockton Street between Sutter and Bush streets, a lot which would therefore, if the proposed work be done, face upon the open cut leading to the southerly mouth of the tunnel. It is alleged in the complaint that Stockton Street between Sutter and Sacramento streets is an improved and accepted street.

The question in dispute, i. e., the power of the municipal authorities to impose the cost of the proposed work upon an assessment district, involves an examination of the provisions of the San Francisco charter, upon which the respondents rely for authority to carry out the improvement in the manner declared in the resolution of intention. It is elementary that "a municipal corporation can exercise only such powers as have been conferred upon it in its charter, or by some general law." (*Von Schmidt* v. *Widber,* 105 Cal. 151, 157, [38 Pac. 682, 684]; *Hyatt* v. *Williams,* 148 Cal. 585, [84 Pac. 41]; 1 Dillon on Municipal Corporations, 4th ed., secs. 89, 91.) The re-

spondents point, in the first place, to section 1 of chapter II
of article II of the charter, which declares that the board of
supervisors shall have power, among other things: "26. To
construct or permit the construction of tunnels, under such
rules and regulations as the board may prescribe." This is the
only reference to tunnels to be found in the charter. It
clearly constitutes a grant of authority to construct tunnels,
but as clearly does not authorize the board to select any
limited area of property within the city and county and im-
pose the burden of the construction upon the owners of such
property. In the absence of a grant of power to assess the
cost of an authorized work upon a special assessment district,
the expense of the work must be borne by the municipality as
a whole, either out of the current revenues or by means of a
bond issue. This is, indeed, conceded by the respondents.
They claim, however, that the power to create an assessment
district in a case like this is conferred upon the board of super-
visors by chapter VI of article VI of the charter. Article VI
relates to the department of public works. Chapter II of this
article is entitled "Improvement of Streets." Its provisions
follow, in the main, those of the general street law, commonly
known as the "Vrooman Act." (Stats. 1885, p. 147.) Chap-
ter VI of article VI was not a part of the charter as originally
framed. It was added by an amendment approved by the
legislature on November 23, 1907. (Stats. (Sp. Sess.) 1907,
p. 41.) (Compare section 38 et seq. of Vrooman Act, incor-
porated by Stats. 1891, p. 116, 1893, p. 89.) By section 1 of
this chapter the board of supervisors is "empowered on the
written recommendation of the board of public works, to
change or modify the grade of any public street, avenue . . .
and to regrade, repave, sewer, sidewalk, curb or otherwise im-
prove the same so as to conform to such change or modified
grade in the manner as hereinafter provided. Before any
change of grade is attempted, the board of supervisors shall
pass a resolution of intention to make such change or modifica-
tion of grade, and it shall in the same resolution, when re-
grading, repaving, sidewalking, sewering, curbing or other
improvement on such street or streets is contemplated in con-
nection therewith, define and establish the district benefited
and to be assessed for the payment of damages and for the
expense of regrading, repaving, sewering, sidewalking, curb-

ing or otherwise improving such street or streets so as to conform with such change or modified grade; and it shall have power at the same time and in the same resolution to provide for the actual cost of performing the work of regrading, repaving, sewering, sidewalking, curbing or otherwise improving such street or streets or portion or portions thereof with the same or other material with which it was formerly graded, paved, sewered, sidewalked, curbed or otherwise improved, briefly describing the work to be done and providing that the cost of the same shall also be assessed upon the same district which is declared to be benefited by such change or modified grade; and it shall have power at the same time and in the same resolution to provide for the actual cost of performing the work of regrading, repaving, sewering, sidewalking, curbing or otherwise improving such street or streets or portion or portions thereof with the same or other material with which it was formerly graded, paved, sewered, sidewalked, curbed or otherwise improved, briefly describing the work to be done and providing that the cost of the same shall also be assessed upon the same district which is declared to be benefited by such change or modified grade. When a change or modification of grade or grades is proposed to be made upon a street, avenue, alley, lane, court or place, which has already been sewered, paved, curbed or graded, no such change or modification of such grade or grades shall be made unless provision shall also be made for the resewering, repaving, recurbing or regrading of such street, avenue, alley, lane, court or place. One or more streets or blocks of streets may be embraced in the same resolution. . . ."

The respondents claim that, inasmuch as the resolution of intention provides for a change of grade upon two blocks of Stockton Street (i. e., from Sutter to Bush and from California to Sacramento streets), the construction of a tunnel under the two intervening blocks (from Bush to California streets) is an exercise of the power to "regrade, repave, sewer, sidewalk, curb or otherwise improve the same so as to conform to such change or modified grade." We think this contention cannot, under any fair interpretation of the language, be maintained. It must be remembered that the resolution of intention does not assume to change the grade of Stockton Street in the two blocks through which the tunnel is to run.

The change of grade is limited to one block south and one block north of the tunnel. From Bush to California streets the grade of the street is to remain as it has been, that is to say running over the crest of the hill. The claim of the city is, then, that the section is intended to authorize, as an incident to a change of grade in one block, not only the regrading, etc., of that block, but the improvement of any number of other blocks which have theretofore been brought to an established grade which remains unchanged.

The charter authorizes the board to change the grade of any street, and to regrade, repave, etc., the same so as to conform to such change. The idea underlying this provision evidently is that the raising or lowering of the grade of an improved street may and probably will necessitate the destruction and replacement in whole or in part of the pavement, sewer, sidewalk, or other improvements which had been laid and constructed in accordance with the old grade. The regrading, repaving, etc., is therefore authorized as a part of the proceeding for change of grade. But it can hardly have been contemplated that the necessity for such repaving or regrading would arise with respect to those portions of the street which are not to be brought to a new grade. Certainly it would be a straining of the ordinary meaning of words to say that the regrading, repaving or other work upon parts of an improved street, the grade of which remained unchanged, was necessary in order to "conform" to a change of grade at some other place. The section, like other provisions of the street law, looks to the ordering or doing of work upon a part less than the entire length of a street. It declares in terms that "one or more streets or blocks of streets may be embraced in the same resolution." The power to repave, etc., is an incident to the change of grade, and must be limited to the length of the changed grade. When it is proposed to change the grade of two blocks of a street, such two blocks constitute the street so far as the change of grade and any improvement incidental thereto are concerned. A reading of the section as a whole leaves no doubt in our minds of the correctness of the construction here given. Take for example the clause declaring that the board shall provide for the cost of regrading, repaving, etc., "such street or streets or portion or portions thereof with the same or other material with which it was

formerly graded, paved . . . or otherwise improved" and the
succeeding one to the effect that when a change of grade is
proposed to be made upon a street which has already been
improved, no such change of grade shall be made "unless pro-
vision shall also be made for resewering, repaving, recurbing
or regrading of such street. . . ." This language clearly indi-
cates that the work authorized is the replacement or recon-
struction of necessary improvements upon those portions of
the street which are to be brought to a new grade, not the
original improvement of other portions of the same street.

Under these views, the creation of an assessment district to
bear the cost of constructing a tunnel in or under a portion of
Stockton Street which remains at its old grade is unauthor-
ized. The proposed improvement is an entire scheme and the
grading and paving of the two blocks at either end of the
tunnel cannot be separated and upheld. In fact, there can be
no doubt that the tunnel is the principal object sought, and
the change of grade at the adjoining blocks is an incidental
thing, undertaken for the purpose of affording approaches
to the tunnel. In the effort to bring the project within the
terms of the charter, the resolution of intention seeks to make
the change of grade on the blocks leading to the tunnel the
principal purpose, and the tunnel itself an incident. This is
a forced construction of the real nature of the undertaking,
and only serves to emphasize the argument that the framers
of chapter VI never contemplated that the burden of what is
here sought to be done could be imposed on a special assess-
ment district.

To avoid any misunderstanding it may be remarked that
the provision in chapter VI is not the only one authorizing
the creation of special assessment districts in connection with
street improvements. Under section 5 of chapter II the ex-
pense of any street work or improvement may be made charge-
able upon a district found to be specially benefited. But the
respondents have not relied upon this section, for the suffi-
cient reason that, under sections 8 and 23 of the same chapter,
all work on accepted streets must be done at the expense of
the city and county. Stockton Street being an accepted street,
the cost of improving it in any way authorized by chapter II
certainly could not be charged to private property-owners,
whether according to frontage, or by the special assessment

district plan. The proceedings are therefore sought to be supported under chapter VI alone, the contention of the defendants in this regard being that work done under this chapter, in connection with a change of grade, is not subject to the rule declared in chapter II, exempting private property from the cost of work on accepted streets. Under the construction we have given to chapter VI, it becomes unnecessary to decide whether this contention is sound. For the same reason, we need not consider appellant's point that, under a proper interpretation of section 1 of chapter VI, the words "otherwise improve" are, under the rule of *ejusdem generis,* to be limited to work of a kind similar to that enumerated in the preceding words, and should therefore be held to exclude the construction of a tunnel. For the purposes of this decision, we have assumed that the wider interpretation urged by respondents is the correct one.

The judgment is reversed.

Shaw, J., Angellotti, J., Melvin, J., Henshaw, J., and Lorigan, J., concurred.

---

[L. A. No. 2582. Department Two.—June 3, 1911.]

## ALFRED L. MILLER et al., Appellants, v. EZRA F. LANE, Respondent.

STATUTE OF LIMITATIONS HOW PLEADED.—A plea of the statute of limitations, alleged in the form prescribed by section 458 of the Code of Civil Procedure, is sufficient for all purposes.

ID.—STOCKHOLDER'S LIABILITY—COLORADO CORPORATION—ACTION IN THIS STATE TO ENFORCE.—An action in this state, to enforce the statutory liability imposed by the laws of the state of Colorado upon the stockholders in a banking corporation, for its corporate debts (Laws of Colo. 1885, p. 264, par. 1), must be considered as one brought to enforce an original liability, against which the statute of limitations commenced to run at least as soon as the date of the commencement of the suit, in the appropriate Colorado court, by the creditors of the corporation to establish the personal liability of each stockholder. Such liability is barred upon the expiration of three years, under section 338 of subdivision 1, and section 359 of the Code of Civil Procedure.

ID.—DEFENDANT SUED IN THIS STATE—LEX FORI.—A defendant sued in
this state, who is and for upwards of ten years has been a resident
of California, cannot be subjected to any special law or judicial
ruling of the state of Colorado, prescribing the forms of action upon
his statutory liability for the debts of the corporation of which he
was a stockholder. In such an action the *lex fori* must prevail.

ID.—CREDITOR'S SUIT IN COLORADO—JURISDICTION OF COLORADO COURTS—
JUDGMENT NOT BINDING ON NON-RESIDENT.—A resident of this state,
who had never been brought within the jurisdiction of the courts of
Colorado, in the suit there brought to establish the personal liability
of the stockholders, is not bound by the judgment in that suit.

APPEAL from a judgment of the Superior Court of Los
Angeles County. George H. Hutton, Judge.

The facts are stated in the opinion of the court.

E. S. Janes, G. L. Whitham, and Tolles & Cobbey, (Denver,
Colo.), for Appellants.

Louis Luckel, for Respondent.

MELVIN, J.—Plaintiffs appeal from a judgment in favor
of defendant, Ezra F. Lane, who was sued upon an alleged
stockholder's liability arising from his ownership of certain
stock of a bank formerly doing business in the state of Colo-
rado. The bank of which Lane was a stockholder had been
found to be insolvent in 1899 and its property had passed into
the hands of an assignee, who settled certain preferred claims
and paid the depositors a percentage of the amounts due them.
By an action commenced June 9, 1905, certain creditors of the
bank proceeded in a court of competent jurisdiction in the
state of Colorado, under the appropriate statute of that state,
and on May 28, 1907, a decree was made and entered by which
the amount of personal liability of each stockholder was de-
clared, Lane's obligation being found to be $5,353. (*Kipp* v.
*Miller,* 47 Colo. 598, [135 Am. St. Rep. 236, 108 Pac. 164].)
By the same decree and in accordance with statutory author-
ity, the Colorado court appointed the plaintiffs herein to rep-
resent and to sue for the benefit of all creditors, and under
this power they brought this action on October 21, 1908.

In his answer the defendant alleged that for more than ten
years immediately theretofore he had resided continuously in

the state of California; that the alleged cause of action arose upon subscription to the capital stock of the state bank of Monte Vista, Colorado; that the shares of stock were issued to him on or about June 15, 1900; that he never resided within the state of Colorado; was never served with process within that state; and that no judgment was ever obtained against him upon any liability by reason of said subscription to said capital stock. He pleaded the bar of the statute of limitations, specifying sections 338, 339, 341 and 359, of the Code of Civil Procedure.

The court found in accordance with practically all of the allegations in the complaint and in substantially the language of the answer, including the bar of the statute of limitations.

Appellants contend that the plea of the statute of limitations in the answer and the court's finding upon that subject goes only to the "subscription to the capital stock," and not to the cause of action set up in the complaint. But we are unable to accept this view, as the allegation of the bar of the statute is in substantially the form prescribed by section 458 of the Code of Civil Procedure. This is sufficient for all purposes. (*Nicholson* v. *Tarpey*, 124 Cal. 449, [57 Pac. 457].)

The question, then, and the only important one, is this: When did the statute of limitations begin to run in favor of defendant? At the trial the plaintiffs introduced in evidence a certified copy of the statute of Colorado, which provides that,

"Shareholders in banks, savings banks, trust, deposit, and security associations, shall be held individually responsible for debts, contracts and engagements of said associations, in double the amount of the par value of stock owned by them respectively." (Laws 1885, p. 264, par. 1.)

The statutory law of Colorado, as interpreted by the supreme court of that state, makes the liability of a stockholder for a corporation's debts a secondary obligation, to be enforced by suit in equity. (*Zang* v. *Wyant*, 25 Colo. 551, [71 Am. St. Rep. 145, 56 Pac. 565]; *Kipp* v. *Miller*, 47 Colo. 598, [135 Am. St. Rep. 236, 108 Pac. 164].) Therefore appellants insist that they have a right to sue under the law of a sister state as interpreted by the supreme court of that state, and that their citation of authorities with regard to secondary obligations are in point. All of the Californian cases cited in this behalf were actions involving recovery from stock-

holders on unpaid subscriptions. (*Turner* v. *Fidelity Loan Concern*, 2 Cal. App. 122, [83 Pac. 62, 70]; *Union Savings Bank* v. *Leiter*, 145 Cal. 696, [79 Pac. 441]; *Glenn* v. *Saxton*, 68 Cal. 353, [9 Pac. 420]; *Harmon* v. *Page*, 62 Cal. 448; *Baines* v. *Babcock*, 95 Cal. 581, [29 Am. St. Rep. 158, 27 Pac. 674, 30 Pac. 776].) We cannot agree with this interpretation of the law. Even if the liability of a stockholder under the statute of Colorado is secondary, it is nevertheless a statutory obligation which cannot be postponed, even by the corporation itself, against the will of the stockholder. All of the Californian cases sustaining judgments of foreign tribunals fixing a stockholder's indebtedness for unpaid subscriptions go upon the principle that such subscriptions are part of the assets of the corporation and that therefore the stockholders are bound to pay only when a proper call has been made for the amounts promised by their subscriptions, such call setting the statute of limitations in motion. While the supreme court of Colorado, in the cases cited above, determines that the liability of the stockholders under the statute is a secondary obligation enforceable in equity, it recognizes that the fund created by the indebtedness of stockholders under the provision of the code of Colorado is not entirely analogous with that existing in the case of an unpaid subscription for stock, because the court holds that the assignee or receiver of an insolvent corporation has no right of action to enforce the liability arising under the statute. As was said in *In re People's Live Stock Ins. Co.*, 56 Minn. 185, [57 N. W. 468]; "The statutory liability is not to be regarded, like that of stock subscription, as corporate assets, with regard to which the corporation represents the stockholders. The two liabilities rest upon an entirely different footing." (See, also, Morse on Banks and Banking, sec. 696; Thompson on Liability of Stockholders, sec. 342; Cook on Corporations, sec. 216; Morawetz on Private Corporations, sec. 869.) The right of action against the stockholder on account of his individual liability for debts of the company accrues at the same time as against the corporation. (*O'Neil* v. *Quarnstrom*, 6 Cal. App. 472, [92 Pac. 391]; *Davidson* v. *Rankin*, 34 Cal. 503; *Mitchell* v. *Beckman*, 64 Cal. 117, [28 Pac. 110]; *Hyman* v. *Coleman*, 82 Cal. 653, [16 Am. St. Rep. 178, 23 Pac. 62].) The statute of limitations of the state

where the suit is brought must govern. (*Platt* v. *Wilmot,* 193 U. S. 602, [24 Sup. Ct. 542, 48 L. Ed. 809] ; *Great Western Telegraph Co.* v. *Purdy,* 162 U. S. 329, [16 Sup. Ct. 810, 40 L. Ed. 986].) It is clear that we must consider the case at bar as one brought to enforce an original statutory liability and it is equally clear that the cause of action against the defendant arose at least as far back as June 9, 1905, when suit was brought by the creditors against the corporation. We cannot subject the defendant, who is and for ten years has been a resident of California, to any special law or judicial ruling of the state of Colorado, prescribing the form of action upon his statutory liability for the debts of the corporation of which he was a stockholder. In such an action as this the *lex fori* must prevail. Mr. Justice Temple, delivering the opinion of the court in *Russell* v. *Pacific Railway Co.,* 113 Cal. 261, [34 L. R. A. 747, 45 Pac. 324], said: "The general rule upon this subject is very well established. Where a statute creates a right and prescribes a remedy for its enforcement, that remedy is exclusive. Where a liability is created which is not penal, and no remedy is prescribed, the liability may be enforced wherever the person is found. The procedure will, however, be entirely governed by the law of the forum. If the law creating the liability provides for the particular mode for enforcing it, the mode limits the liability."

The defendant Lane never having been brought within the jurisdiction of the courts of Colorado, the judgment pleaded against him was not binding. (*Godfrey* v. *Terry,* 97 U. S. 171, [24 L. Ed. 944].) Regarded as a liability created by statute the cause of action was barred by subdivision 1 of section 338 of the Code of Civil Procedure, and section 359 of the same code.

The judgment is affirmed.

Henshaw, J., and Lorigan, J., concurred.

[Sac. No. 1876.   Department Two.—June 3, 1911.]

## SUNRISE LAND COMPANY (a Corporation), Respondent, v. ABBIE J. ROOT, Appellant.

Specific Performance—Appeal from Judgment—Diminution of Record—Insertion of New Allegation in Complaint not Allowable—Opinion of Trial Judge—Evidence.—On an appeal by the defendant from a judgment decreeing the specific performance of a contract for the sale of land, and taken on the judgment-roll alone, in which the parties have stipulated to the correctness of the record, the supreme court, on suggestion of diminution of the record, has no power to permit allegations to be inserted in the complaint, which were never a part thereof, respecting the reasonableness of the contract and the adequacy of the consideration received by the defendant; nor can it consider statements respecting such matters contained either in the opinion of the trial court, or in excerpts from the evidence.

Id.—Complaint Must Allege Adequacy of Consideration.—A complaint for the specific performance of a contract for the sale of land must allege the adequacy of the consideration received by the defendant. A mere allegation that the contract was in writing and that the sale was "legally and fairly" made is insufficient.

APPEAL from a judgment of the Superior Court of Stanislaus County.   L. W. Fulkerth, Judge.

The facts are stated in the opinion of the court.

Maddux & Maddux, and D. M. Young, for Appellant.

L. L. Dennett, E. H. Zion, and J. M. Walthall, for Respondent.

MELVIN, J.—Plaintiff brought an equitable action to enforce the specific performance of a contract for the sale of 840 acres of land in Stanislaus County, at one hundred dollars per acre. This contract was made by plaintiff and Messrs. Root & Saunders (co-partners), alleged in the complaint to be defendant's duly authorized agents for the sale of the land, the written agreement between defendant and the said co-partnership granting the latter full power to contract for the

sale of any or all of the land described in the complaint, being made a part of the pleading. Defendant demurred to the complaint; her demurrer was overruled; and after she had answered, the case was tried on its merits, with the result that judgment was rendered in favor of plaintiff, decreeing specific performance of the contract. From this judgment defendant appealed on the judgment-roll alone, the record being authenticated by stipulation of counsel that it correctly set forth the complaint, demurrer, proceedings of argument on demurrer, minute order overruling defendant's demurrer to the complaint, etc. Appellant filed her points and authorities, resting her appeal upon the single contention that her demurrer should have been sustained because of want of sufficient facts in the allegations of the complaint, and it is pointed out in the brief of her attorneys that said complaint fails to allege that defendant received an adequate consideration for the contract, or that it was as to her just and reasonable. Thereafter, plaintiff filed a document entitled "Suggestion of diminution of record," asking permission to insert at the proper places in the complaint an allegation respecting the reasonableness of the contract and adequacy of consideration, which would meet the point made in appellant's brief. This amendment was sought for the reason, as stated by one of plaintiff's counsel in an affidavit accompanying the "Suggestion of diminution of record," "that the said allegation in the complaint was inadvertently omitted and the findings inadvertently made to follow the complaint, and the point was never raised that such allegations were omitted, but on the other hand, the case was tried by the court and the evidence was introduced without objection showing the reasonableness of the consideration and that the complaint was amended by implication and the first time that the point was ever raised specifically by the defendant was on her brief on appeal herein." This document also presents the written opinion of the judge of the superior court who tried the case, and certain extracts from the testimony at the trial. Respondent seeks to utilize part of this opinion as a finding upon the adequacy of consideration, and to show by the selected portions of the testimony that this matter was thoroughly tried in the action. We have no power to correct a record by inserting allegations in the complaint which were never there, and cannot, of course, receive respondent's sug-

gestion that such averments be supplied after an appeal in which its attorneys stipulate to the correctness of a record containing no such allegations. By such action we would deprive defendant not only of her right to answer, but of the privilege of meeting, perhaps, by sufficient proof, statements which, under the condition of the record at the trial, she was not called upon to controvert. Neither can we consider the opinion of the learned judge of the trial court in lieu of a finding, even if we should ignore the appellant's suggestion that such opinion cannot be part of the record of an appeal on the judgment-roll alone, because such finding, in the absence of the proper allegation in the complaint, would be without the issues. (*Kaiser* v. *Barron,* 153 Cal. 790, [96 Pac. 806].) The excerpts from the evidence have no place here because there is no bill of exceptions. We must, therefore, of course, consider the case in the light of the original record. Respondent contends that there was sufficient allegation and finding of adequacy of consideration because a written contract was alleged and the court found that the sale was "legally and fairly" made. While it is not necessary that, to conform to the requirements of section 3391 of the Civil Code, it must be alleged in the complaint and found by the court *in haec verba* that "the contract was supported by an adequate consideration" (*Wait* v. *Kern River Mining etc. Co.,* 157 Cal. 25, [106 Pac. 102]), nevertheless the complaint and findings in this case fall far short of the measure long established by courts of equity. A sale might be "legally" made in that an agent had power to bind his principal, and while it might be "fairly" conducted in respect to full disclosure to the purchaser of all of the matters pertaining to the property, yet the consideration might be so inadequate as to shock the conscience of the chancellor. As was said by the chancellor in *Seymour* v. *Delancey,* 6 Johns. Ch. (N. Y.) 225, (language quoted more than once by this court) : "A court of equity must be satisfied that the claim for a deed is fair and just, and reasonable, and the contract equal in all its parts, and founded on an adequate consideration, before it will interpose with this extraordinary assistance." As the complaint failed to set up the adequacy of the consideration, the demurrer should have been sustained. (Civ. Code, sec. 3391; *Kaiser* v. *Barron,* 153 Cal. 790, [96 Pac. 806] ; *White* v. *Sage,* 149 Cal. 614, [87 Pac. 193] ; *Stiles*

CLX Cal.—7

v. *Cain,* 134 Cal. 171, [66 Pac. 231] ; *Bruck* v. *Tucker,* 42 Cal.
354 ; *Agard* v. *Valencia,* 39 Cal. 302.)

There is nothing in respondent's point that inasmuch as the
co-partners had done much work in negotiating for the sale
of land, the contract was partly executed, and therefore its
adequacy not a matter subject to inquiry.   The agents are not
parties to this action and their contract with appellant is not
in issue here.

The judgment is reversed, with instructions to the court
below to sustain defendant's demurrer.

Henshaw, J., and Lorigan, J., concurred.

---

[Sac. No. 1756.   Department Two.—June 3, 1911.]

AL BREITENBUCHER and A. A. MARTIN, Respondents,
    v. E. OPPENHEIM and H. E. KLEINSORGE, Res-
    pondents, and H. H. HEWLETT, Appellant.

RESULTING TRUST—ACTION TO ESTABLISH—PLEADING PAROL CONTRACT
    SIMILAR TO LEGAL IMPLICATION.—An action to establish a resulting
    trust in land arising from a part payment of the consideration is
    not changed into an action to establish an express trust therein,
    merely by the averment of a verbal agreement respecting the pur-
    chase of. the land which, in the absence of any contract, the law
    would imply.

ID.—EVIDENCE OF PAROL AGREEMENT ADMISSIBLE.—In such action evi-
    dence is admissible of such verbal agreement for the purpose of
    showing the entire transaction out of which the resulting trust is
    claimed to have arisen.

ID.—PAYMENT OF CONSIDERATION FOR PURCHASE OF LAND.—In order
    that a trust may result in favor of one contributing to the con-
    sideration for a transfer of land, the title to which is taken in the
    name of another, it is not necessary that the consideration should
    have been paid by him.   It is enough if it was paid for him.

ID.—FINDING OF RESULTING TRUST—EVIDENCE—INCONSISTENT ACTS OF
    PLAINTIFF.—Where the evidence, although contradictory, is sufficient
    to sustain the finding of the trial court establishing a resulting trust,
    the appellate court will not interfere therewith, merely because cer-
    tain isolated acts of the plaintiff, when considered by themselves,
    seem inconsistent with that theory.

ID.—INTEREST PROPORTIONATE TO CONSIDERATION PAID.—Where there is no uncertainty regarding the amount of money contributed by one person towards the purchase price of land, the title to which is conveyed to another, and its proportion to the entire purchase price, a trust results in the land for the person who has contributed to the purchase price proportionate to the amount so paid by him.

ID.—NON-JOINDER OF PARTIES—APPEAL.—A question of non-joinder of parties, which was not raised by demurrer or otherwise in the trial court, cannot be raised for the first time on appeal.

ID.—NOTES AND DEED OF TRUST FOR PART OF PURCHASE PRICE—JUDGMENT DETERMINING INTEREST OF PARTIES.—The fact that the parties in whose name a transfer of land was taken, gave their individual notes secured by a deed of trust of the land as part payment of their share of the purchase price, will not warrant the reversal of a judgment establishing a resulting trust in the land, in which the interest of the parties was adjudged to be in proportion to the amount contributed by each, either in money or in notes, and leaving unaffected any lien that the trustee, who was not made a party to the action, might have on account of the balance of the purchase price.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order refusing a new trial. Frank H. Smith, Judge.

The facts are stated in the opinion of the court.

Charles H. Fairall, and Avery C. White, for Appellant.

Murphy & Percival, and R. C. Minor, for Plaintiffs and Respondents.

Clary & Louttit, for H. E. Kleinsorge, Defendant and Respondent.

MELVIN, J.—H. H. Hewlett, one of the defendants, has appealed from a judgment in favor of plaintiffs, and from an order denying his motion for a new trial. The action was brought for the purpose of having a resulting trust declared in favor of plaintiffs, and for an accounting of the rents and profits of the property involved. The court found that defendants Oppenheim and Hewlett on the first day of May, 1905, purchased from one Covell a certain tract of land in San Joaquin County for $16,725; that Oppenheim paid on said purchase price $8,362.50, or one half thereof, Hewlett $7,000, or 415-1000 thereof, and the plaintiffs $1,362.50, or

85-1000 of the entire amount expended in the purchase of the said real property; that by agreement between plaintiffs and defendants, Oppenheim and Hewlett, the deed to the property was taken by the two latter persons; that Hewlett did not purchase an undivided one-half interest in the land for seven thousand dollars, but that he did have relations with plaintiffs as co-purchasers; that Hewlett held an undivided 85-1000 of the said property in trust for plaintiffs; and that Breitenbucher and Martin were entitled to their proportionate share of the rents, issues, and profits for the years 1905, 1906, and 1907. Defendant Kleinsorge was at the time of the trial the owner of all of Oppenheim's origina. interest.

There is a conflict in the evidence as to many matters, but Hewlett by his answer does not deny that the entire purchase price of the property was $16,725, and that he paid seven thousand dollars. Plaintiffs were conducting a real estate business at Lodi, under the name of the Realty Company. They acquired an interest in certain property owned by one Beardslee, and were also trying to sell Covell's property, on which Oppenheim held an option, on which he had paid one thousand dollars. Breitenbucher went to Hewlett with the proposition that the latter purchase his portion of the Beardslee property and also an interest in that of Covell. He wrote a letter to Hewlett in which it was shown that a half interest in the Beardslee property could be obtained for twenty-five hundred dollars cash, together with the assumption of a mortgage interest, and that the Covell land could be had for $7725 in cash and three notes for three thousand dollars each, payable in eighteen, thirty, and forty-two months, respectively, amounting in all to $16,725 as the purchase price of the property. The letter contained this sentence: "One half of the above cash, $3,862.50, provided for as follows: $2500 in cash; $1362.50 advanced on the crop. Necessary to swing the two deals, $5000 net." Appellant contends that, as shown by this letter, he and plaintiffs contemplated a transfer to him of a half interest for a payment of twenty-five hundred cash, and that the rest of the money was to be raised by an advance on the crops. Breitenbucher explains the item in the letter by saying that at first he and Hewlett talked about getting money on the crop to take care of a part of the cash payment, but that they afterwards abandoned that idea and concluded

to pay all the cash demanded, and to handle the crop as they saw fit. Hewlett said upon cross-examination that there was no discussion at the time the purchase was consummated about a reduction in the price of the property or the manner in which the item of $1,362.50 was to be paid. He simply depended, he said, upon Breitenbucher's promise that for twenty-five hundred dollars cash and certain notes he should acquire a half interest. He denied any knowledge of the note for $1,362.50 given by plaintiffs to Oppenheim, or of any payment made by or on behalf of Martin and Breitenbucher for the property. This testimony is squarely contradicted by that of Breitenbucher and Oppenheim. The former said that he and Hewlett had an agreement whereby Hewlett was to take a quarter interest for himself and to advance the money for a quarter interest for Martin and Breitenbucher, taking their note therefor; but that when the parties were ready to close the sale, Hewlett did not have sufficient money to carry out this arrangement, and that then the money was borrowed from Oppenheim on the note of Breitenbucher and Martin. This was paid on the purchase price, and Breitenbucher told Hewlett that they "would fix it up later." A few days subsequently he called upon Hewlett and sought an understanding in reference to his interest, but according to his testimony, Hewlett said: "Never mind, we just bought this on speculation; we will turn it over right away, and we will fix it up at the time we make the sale." Defendant Oppenheim corroborated Breitenbucher in many particulars. He testified that when they met on May 1, 1905, to conclude the purchase of the Covell property, Hewlett said he was going to take an interest, but did not specify what interest. Hewlett, he said, lacked just $1,362.50 of enough to pay for a half interest, so witness paid that amount for Martin and Breitenbucher, taking their note. This note was not made in Hewlett's presence. Breitenbucher, however, testified positively that Hewlett knew all about the transaction and tacitly agreed to it. He said: "I did not borrow money on the crop. Borrowed it from Mr. Oppenheim. Mr. Hewlett knew this at the time the sale was consummated. He was there at the time. I told him that we were short $1,362.50 and he said he could not furnish that amount of money so I told him that I would furnish it or get it from Mr. Oppenheim. I spoke to Mr.

Oppenheim about it and he said yes. He said he would loan us boys that amount of money to put into this deal. I think I was the first to mention the fact that he was short. We figured on the lines of getting some money on the crop. I told him we could not get the money on the crop. I told this to Mr. Hewlett."

Appellant's first contention is that, according to the theory of plaintiffs and their evidence, an express trust was sought to be established by parol, and that such a trust being within the statute of frauds, the idea of a resulting trust was an after-thought brought before the court by an amendment to the complaint. It is true that the complaint, before its amendment, alleged an agreement for the purchase of the land, by which undivided interests were to be assigned in exactly the proportions afterwards fixed by the court in its findings on the resulting trust, but the averment of exactly the verbal agreement which, in the absence of any contract the law would imply, would not alter the nature of the action. (*Bayles* v. *Baxter,* 22 Cal. 578; *Gerety* v. *O'Sheehan,* [9 Cal. App. 447], [99 Pac. 546]; *Faylor* v. *Faylor,* 136 Cal. 93, [68 Pac. 482].) While it is true that a resulting trust may be defeated by parol evidence of a contract different from that implied by law, we do not agree with appellant that this is a case for the application of the rule. The agreement which, according to Breitenbucher's testimony, was made by him and Hewlett with reference to the advancement by Hewlett of money to buy a quarter interest for Martin and Breitenbucher was abandoned when Hewlett announced his inability to raise more than five thousand dollars in cash for the purchase of interests in the Beardslee and Covell properties. Yet it was proper for the court to hear evidence of such agreement in getting the history of the entire transaction. The supreme court of Nevada in *White* v. *Sheldon,* 4 Nev. 151, (292) (Ed. 1877, vols. 3-4, p. 751) said: "That no parol agreement between the parties giving to an implied trust an effect or character different from that which the law would create from the acts of the parties could be admitted in evidence in cases of this kind there is little doubt, for that would be simply creating an express trust by parol, which the law does not tolerate. But that all the facts and circumstances out of which the implied trust is raised, may be proven is clear, otherwise the trust itself could

not be established." The note given by Breitenbucher and Martin to Oppenheim at the time of the purchase of the land from Covell had not been paid when this action was tried. Breitenbucher explained that the makers of the note had expected to pay it from their share of the crops. Appellant contends that the giving of the note under the circumstances shown, indicated the intent of plaintiffs to secure their advance "either out of the proceeds of the land or of the sale thereof." Clearly they could claim none of the profits of the land unless they owned an interest in it. True, the Realty Company afterwards took an agreement for the sale of the land from the owners of the title, and it is the theory of appellant that the $1,362.50 was contributed to the purchase price to insure a consummation of the sale on May 1, 1905 (the last day of Oppenheim's option), the plaintiffs (who owned nearly all the stock of the Realty Company) expecting to recoup themselves for this amount from their commissions on that transaction and on a subsequent sale which they hoped to make for Oppenheim and Hewlett. But there is nothing to support this theory. Appellant does not assert that they disclosed any such plan to him, and it seems improbable that they should have secretly advanced the amount obtained on their note. The only basis for this deduction on his part is his assertion that he was promised a half interest for a cash payment of twenty-five hundred dollars.

The evidence is sufficient to sustain the finding that upon receiving the note Oppenheim paid the amount represented by it for and on behalf of plaintiffs, thus creating a resulting trust, because, "in order that a trust might result in their favor, it was not necessary that the consideration for the transfer should have been paid by them. It was enough if it was paid for them." (*Barroilhet* v. *Anspacher,* 68 Cal. 121, [8 Pac. 804] ; Civ. Code, sec. 853.) Appellant calls our attention to the fact that plaintiffs permitted the proceeds of the crops to be equally divided between him and Oppenheim until the time of the commencement of this action. This, according to appellant, shows that the claim by plaintiffs of an interest in the property was an afterthought. But it is not for us to weigh the evidence for the purpose of determining whether or not some acts of plaintiff might, when considered by themselves, seem inconsistent with the facts found. The court

below heard and considered all the evidence, and we cannot say that its conclusions were not justified, nor are we unmindful in so holding of the rule that the evidence necessary to establish a trust must be clear, satisfactory and convincing. (*Sheehan* v. *Sullivan,* 126 Cal. 193, [58 Pac. 543].) Appellant cites many authorities to support the contentions that "Where two or more persons purchase land in equal proportions and pay unequal sums on the purchase price, the one paying the greater portion has no resulting trust for such excess payment"; and that "a contribution of money towards the entire purchase of land is not sufficient to create a resulting trust in favor of the contributor unless the contribution is shown to have been paid for some specific part of the land." Without reviewing these authorities, we may say that many of them are so dissimilar to this case as to be of little value. Undoubtedly there are many cases in which payment of unequal sums by purchasers of property does not indicate the acquirement of unequal interests. It is equally true that resulting trusts will not be declared where it is impossible definitely to establish the proportion of the purchase price contributed by the person in whose behalf the existence of the trust is asserted. This is the doctrine of such cases as *Woodside* v. *Hewel,* 109 Cal. 486, [42 Pac. 152]; *Los Angeles etc. Co.* v. *Occidental Oil Co.,* 144 Cal. 534, [78 Pac. 25]; *Plass* v. *Plass,* 122 Cal. 11, [54 Pac. 372]; *Sheehan* v. *Sullivan,* 126 Cal. 193, [58 Pac. 543], and other cases cited by appellant. But here there is no uncertainty regarding the amount of money contributed for plaintiffs and its proportion to the entire purchase price, and, as was said in *South San Bernardino Land & Imp. Co.* v. *San Bernardino Nat. Bank,* 127 Cal. 247, [59 Pac. 700]: "It is settled law that where one pays the purchase price of land and the land is thereupon conveyed to another, the title to the land is held, under such conveyance, in trust for the person who has paid the purchase price. (Civ. Code, sec. 853.) This principle is also applied so as to make the payment of a part of the purchase money carry with it a proportionate equitable estate in the land purchased equal to the amount paid (2 Pomeroy's Equity Jurisprudence, sec. 1038.)" (See, also, *Gerety* v. *O'Sheehan,* 9 Cal. App. 447, [99 Pac. 546]; *Somers* v. *Overhulser et al.,* 67 Cal. 237, [7 Pac. 645].)

At the time of the sale certain notes secured by deed of trust were executed by Hewlett and Oppenheim. Plaintiffs were not parties to this portion of the transaction, and the contention is made that it is impossible to declare their interest in the land, owing to the existence of these notes and the trust-deed, and that, in any event, this action must fail because the trustee was not made a party to it. It is not necessary to consider the question of non-joinder, as it was not raised by demurrer or otherwise in the superior court, and it cannot be suggested for the first time in this court. A complete answer to the first contention also is the fact that it was not raised by the pleadings. Appellant by his answer averred the payment of seven thousand dollars for a half interest, and did not deny that the total consideration was $16,725. Under the pleadings and proof the court adjudged the interest of the parties to be in proportion to the amount contributed by each (either in money or in notes) leaving unaffected any lien that a stranger to this record might have on account of the balance of the purchase price. The share of plaintiffs is as much affected *pro tanto* by the trust-deed as are the shares of appellant and of Oppenheim's successor in interest, although the part of the purchase price which was advanced for plaintiffs has been paid to Covell, the trustee, in cash, while the other shares were partly bought by the notes to secure which the trust-deed was executed. We cannot see how the judgment, therefore, adds anything to the burdens under the trust-deed of either the appellant or Oppenheim's successor.

There are no other matters in the record which seem to require attention, and, in accordance with the views expressed in the foregoing discussion, the judgment and order from which appeals have been taken are affirmed.

Henshaw, J., and Lorigan, J., concurred.

[L. A. No. 2445. In Bank.—June 5, 1911.]

WESTERN UNION TELEGRAPH COMPANY (a Corporation), Respondent, v. ED. W. HOPKINS, County Assessor of the County of Los Angeles, Appellant.

POST ROADS—LETTER-CARRIER ROUTES—CITY STREETS.—The streets of the city of Los Angeles kept up and maintained as such are letter-carrier routes established in such city for the collection and delivery of mail matter, and consequently are post roads under section 3964 of the United States Revised Statutes.

ID.—TELEGRAPH COMPANIES—FEDERAL FRANCHISE TO USE POST ROADS— USE OF CITY STREET—TAXATION OF FEDERAL FRANCHISE NOT PERMITTED.—The right conferred upon telegraph companies, by the act of Congress of July 24, 1866, to construct, maintain, and operate lines of telegraph "over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress," is not limited to such military and post roads as are upon the public domain, but extends to all in the United States, including those in the various states. Under such act, a telegraph company has such rights in regard to the streets of a municipality as are granted by the act in regard to military or post roads. Such rights constitute its federal franchise, which is not assessable for taxes by the state, county, or municipality.

ID.—FEDERAL FRANCHISE SUBJECT TO RIGHT TO CHARGE FOR PORTION OF STREET EXCLUSIVELY USED.—The privilege conferred by the act of Congress of July 24, 1866, on telegraph companies to construct, maintain, and operate lines of telegraph over such post roads as are public streets or highways of a state, is subject to the right of the state to charge and receive compensation from the telegraph company for the use by it of so much of the street or highway as is exclusively devoted to its purposes.

ID.—GRANT BY STATE OF EXCLUSIVE POSSESSION—STATE FRANCHISE— ASSESSMENT AND TAXATION OF.—If the state grants to such a company the right to such exclusive possession of portions of its public highways without compensation, the company obtains thereby something not acquired by it under the act of Congress. Such right so acquired by the company is a franchise granted by the state, having for purposes of assessment a local *situs,* and being assessable in the particular city or county in which the streets so occupied are situated.

ID.—ACCEPTANCE OF STATE FRANCHISE—EXCLUSIVE OCCUPANCY OF PORTIONS OF STREET.—Where there is a valid law of the state purporting to grant such right to telegraph companies generally, the exclusive

occupancy by a company of portions of public highways for the authorized purposes is an acceptance by it of the offered franchise.

ID.—CITY STREETS ARE PUBLIC HIGHWAYS.—The term "public highways," includes streets in cities.

ID.—CONTROL OF STATE OVER CITY STREETS.—The state, in its sovereign capacity, has the original right to control all public streets and highways, and except in so far as that control is relinquished to municipalities by the state, either by provision of the, state constitution or by legislative act not inconsistent therewith, it remains with the state legislature to be exercised in any manner not prohibited by the state constitution.

ID.—STATE STATUTE GRANTING TELEGRAPH COMPANIES USE OF PUBLIC ROADS—SECTION 536 OF CIVIL CODE—EXCLUSIVE OCCUPATION OF PORTIONS OF STREETS—STATE FRANCHISE.—Section 536 of the Civil Code, as it was originally adopted in 1872, authorizing telegraph corporations to construct lines of telegraph along and upon any public road or highway, and to erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, constituted a grant to telegraph companies of rights in regard to the streets of cities, in addition to the rights given by the act of Congress, which to the extent that they were accepted and availed of by any company, constituted a franchise granted by the state and accepted by the company. This state franchise included the right to such exclusive occupation by the company of portions of the streets as is maintained for the purposes of its system, leaving nothing in that behalf to be granted by the municipality. So far as a telegraph company holds these rights, it holds them solely under and by virtue of that section of the Civil Code.

ID.—ACCEPTANCE OF FRANCHISE—MAINTENANCE AND OPERATION OF TELEGRAPH SYSTEM—CONTRACT BETWEEN COMPANY AND STATE—IMPAIRMENT OF OBLIGATION.—Assuming that section 536 of the Civil Code was a grant of the right to such use of the streets of a municipality, the maintenance and operation of such system by a telegraph company constituted an acceptance by it of the provisions of that statute, which thereby became a contract between the company and the state, secured by the constitution of the United States against impairment by any subsequent state legislation.

ID.—CONSTRUCTION PRIOR TO ADOPTION OF STATUTE—SUBSEQUENT MAINTENANCE OF EXCLUSIVE POSSESSION OF STREETS—ACCEPTANCE.—The fact that a telegraph company constructed its lines in the streets of a municipality, prior to the adoption of section 536 of the Civil Code, does not show that it never manifested any acceptance of the rights offered by the statute, and has exercised no franchise thereunder. The grant of the right to "construct" and "erect," contained in the section, necessarily implied the right to maintain, and although the construction was before the adoption of that section, the continued maintenance of exclusive possession of portions of highways without compensation was a sufficient acceptance.

ID.—GRANT OF STATE FRANCHISE CONSTITUTIONAL—REVOCATION—POLICE
POWER.—Section 536 of the Civil Code is constitutional, and oper-
ated as a grant by the state to all telegraph companies accepting the
same, of the rights therein specified. To the extent that such offer
of the state was accepted by a telegraph company by actual occu-
pation of a highway prior to any repeal, modification or suspension
of the section, no right of revocation having been reserved, such
telegraph company has vested rights subject only to the proper
exercise of the police power, that cannot be taken away by the state
or city without compensation.

ID.—STATE HAS NO RESERVED RIGHT TO REVOKE FRANCHISE—CONSTITU-
TIONAL LAW.—No right to revoke such vested rights was reserved
to the state, either under the provisions of the constitution of 1849
or of 1879, declaring that all laws passed pursuant to the section
providing for the formation of corporations may be altered from
time to time or repealed, or under the provisions of section 327 of
the Political Code, providing that a statute may be repealed at any
time except when otherwise provided therein, and that persons act-
ing thereunder are deemed to have acted in contemplation of such
power of repeal.

ID.—CONSTITUTION OF 1849—UNIFORM OPERATION OF LAW—SPECIAL
LEGISLATION.—There was nothing in the state constitution of 1849
that prohibited the granting of such rights to telegraph corporations.
The fact that the grant made by section 536 of the Civil Code
was limited to "corporations," and does not include natural persons
or partnerships, does not invalidate the grant by making it in con-
flict with section 11 of article I of that constitution, requiring that
"all laws of a general nature shall have a uniform operation." Nor
is that section violative of the provisions of the present constitution
prohibiting special legislation.

ID.—CLASSIFICATION BY LEGISLATURE—EXCLUSIVE GRANT TO CORPORA-
TIONS.—The courts may assume that good and sufficient reasons were
apparent to the legislature why the right to exclusively occupy por-
tions of the public highway for the purposes specified should be
confined to corporations organized and existing for the purpose of
doing a telegraph business, and why such corporations constitute a
class to which such a grant may properly be restricted without
violating the constitutional provisions against special legislation. So
assuming, the legislation must be upheld.

ID.—CONSTITUTIONAL REPEAL OF NON-USED FRANCHISE.—Section 6 of
article XII of the present constitution, declaring that "all existing
charters, grants, franchises, special or exclusive privileges, under
which an actual and *bona fide* organization shall not have taken
place, and business been commenced in good faith, at the time of
the adoption of this constitution, shall thereafter have no validity,"
did not operate to repeal section 536 of the Civil Code. So far as
any company had not, at the time of the adoption of that constitu-
tion, availed itself of and thus accepted the provisions of section 536

of the Civil Code, there was no "existing" grant or franchise to be annulled, and there never was any "special or exclusive" privilege given by the section.

ID.—WESTERN UNION TELEGRAPH COMPANY—FRANCHISE TO USE STREETS OF LOS ANGELES—TAXATION.—The exclusive occupation by the Western Union Telegraph Company of portions of the streets of the city of Los Angeles without liability for compensation, to the extent at least to which its system was constructed therein at the time of the adoption of section 536 of the Civil Code, and its right to such occupation free of charge by the city, are based solely on that section, and as to such occupation and right, that section constitutes a grant in the nature of a franchise accepted by it, constituting property located within this state and assessable in the county of Los Angeles. The taxation of this franchise is in no way taxation of its federal franchise.

APPEAL from a judgment of the Superior Court of Los Angeles County. George H. Hutton, Judge.

The facts are stated in the opinion of the court.

J. D. Fredericks, District Attorney, and Hartley Shaw, Chief Deputy, for Appellant.

Leslie R. Hewitt, City Attorney, W. B. Mathews, and John W. Shenk, *Amici Curiæ*, for the City of Los Angeles.

J. P. Wood, City Attorney, and Wm. J. Carr, Assistant City Attorney, *Amici Curiæ*, for the City of Pasadena.

Beverly L. Hodghead, George H. Fearons, and Brown & Wells, for Respondent.

Pillsbury, Madison & Sutro, *Amici Curiæ*, for the Sunset Telephone and Telegraph Co., et al.

ANGELLOTTI, J.—The assessor of Los Angeles County levied an assessment against the plaintiff for the fiscal year ending June 30, 1908, in the sum of fifty thousand dollars, upon its "franchise granted by the state of California to use the public highways of the city of Los Angeles," fixed a tax on said assessment at the rate of taxation applicable to property as to which he was authorized to collect taxes, the same amounting to $520, and was proceeding, in accordance with

the law relative to enforcement of the tax in cases where he was authorized to collect, to seize and sell certain personal property of plaintiff in satisfaction of the tax. This action was thereupon commenced by plaintiff to enjoin him from proceeding with the collection of such tax, on the ground that said assessment and tax are void. This claim of plaintiff was sustained by the trial court, and judgment was accordingly given in favor of plaintiff. This is an appeal by defendant assessor from such judgment. The case was submitted to and decided by the trial court upon an agreed statement of facts. No question is made as to the propriety of the remedy by injunction in this case, "if in fact the assessment made against plaintiff was invalid." The question presented for our determination on this appeal is the validity of this assessment upon the agreed facts.

Plaintiff, a New York corporation, engaged in an interstate telegraph business, on June 12, 1867, duly accepted the terms and privileges, restrictions and obligations of the act of Congress approved July 24, 1866, entitled "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal and military and other purposes." That act provides that any telegraph company accepting in writing the restrictions and obligations required by the act "shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams or waters of the United States; provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads." Plaintiff ever since its acceptance of this act has been entitled to the privileges granted thereby. In the year 1870 plaintiff first constructed its telegraph system in the city of Los Angeles, and has ever since maintained and operated it therein, repairing, reconstructing, adding thereto, and changing the location of its wires in some cases from one street to another, all as the demands of its business in said city requried. For many years last past it has continuously maintained its lines of telegraph

through, over and upon the public roads, streets, and highways, kept up and maintained as such in the county of Los Angeles, in the city of Los Angeles, in the state of California, and elsewhere throughout the United States. On the first Monday of March, 1907, it had erected and was maintaining and operating on certain streets and highways of said city, kept up and maintained as such, as a part of its general telegraph system, poles with wires strung thereon, all so placed as not to interfere with ordinary travel on said streets or highways, and also a little less than one mile of underground conduit underneath the surface of said streets. Plaintiff has never obtained or received any franchise from the city of Los Angeles for the use of any of its streets for the construction or maintenance of its telegraph system, and it has no franchise whatever for such use of the streets of the city other than its federal franchise granted by the act of Congress of July 24, 1866, and other than such franchise, if any, as it has under section 536 of the Civil Code of California. Plaintiff has never claimed to have or to have exercised any franchise under said section 536 of the Civil Code.

It is to be borne in mind that the only right or franchise here involved is the one granted by the state, if any, to use the public highways of the city of Los Angeles, the assessment being limited by its terms to that particular right, and not including the right to use public highways in the county of Los Angeles outside of said city. The franchise alleged to have been so granted was one for the construction of lines of telegraph along and upon any public road or highway by any telegraph corporation, which, like the grant made by section 19 of article XI of the constitution regarding the use of streets for water or gas-pipes, would vest only when actually accepted by the exercise of the right granted and would be assessable only in the place where such exercise is had. (*Stockton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 318, [5 L. R. A. (N. S.) 174, 83 Pac. 54].)

It was erroneously stated in the opinion of Mr. Justice McFarland in *Western Union Co.* v. *Visalia,* 149 Cal. 744, [87 Pac. 1023], that section 3964 of the Revised Statutes of the United States provides that "all public roads and highways while kept up and maintained as such are declared to be post roads." That section contains no such provision, it being lim-

ited so far as public streets or roads are concerned, to certain roads during the time mail is carried thereon. The provision referred to in that opinion is in another act of Congress, and is incorrectly quoted in that the words "post routes" are used in the act instead of "post roads." (23 U. S. Stats., p. 3, [U. S. Comp. Stats. 1901, p. 2708].) It has been held that the terms are not synonymous, and that letter-carrier routes in cities were not post roads until declared such by said section 3964, although they were post routes. (*Blackhaus* v. *Gresham,* 16 Fed. 611.) Said section 3964 provides that "all letter-carrier routes established in any city or town for the collection and delivery of mail matter" shall be post roads. We think that we are warranted in assuming that the streets of the city of Los Angeles kept up · and maintained as such are letter-carrier routes established in such city for the collection and delivery of mail matter, and consequently are post roads under section 3964 of the United States Revised Statutes. (Code Civ. Proc., sec. 1875, subd. 3.) If this be so, it is unnecessary to determine the effect of the statute declaring all public roads and highways to be post routes. What we have said in this matter is called forth by the claim of defendant that as the agreed statement of facts does not state whether the streets of the city of Los Angeles occupied by plaintiff are letter-carrier routes, plaintiff has failed to show that its federal franchise granted by the act of July 24, 1866, covers such streets, a question considered material in determining whether as to the streets of the city of Los Angeles plaintiff has acquired any valuable right under section 536 of the Civil Code of this state.

It was held by the United States supreme court in the case of *Pensacola Tel. Co.* v. *Western Union Tel. Co.,* 96 U. S. 1, [24 L. Ed. 708], that the act of July 24, 1866, is not limited to such military and post roads as are upon the public domain, but extends to all in the United States, including those in the various states. It was said: "These are all within the dominion of the national government to the extent of . the national powers, and are, therefore, subject to legitimate congressional regulation." The power to make such provision as to military and post roads situated in the various states was held to be included in the powers granted to the national government to regulate commerce

among the several states and to establish post-offices and post roads. There has been no modification of these rules by any subsequent decision of that court, which, of course, is the final arbiter on such questions. It is clear, therefore, that plaintiff has under this act of Congress such rights in regard to the streets of the city of Los Angeles as are granted by the act in regard to military or post roads. Such rights constitute its federal franchise. There is no pretense that this federal franchise may be assessed for taxes by the state, county, or municipality, and the assessment here involved does not purport to include it, being confined in terms to an alleged franchise granted by the state of California.

The claim of grant of franchise by the state is based solely on section 536 of the Civil Code. That section as originally adopted in 1872 was as follows: "Telegraph corporations may construct lines of telegraph along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." A very similar provision was to be found in our laws relating to telegraph companies or associations organized under the laws of the state of California for many years prior to the adoption of the code. (See Stats. 1850, p. 369, and Stats. 1857, p. 171.) This section has never been expressly repealed or amended in any particular except by expressly extending the privileges therein granted to telephone corporations, which was done in the year 1905 by a repeal of the section and its re-enactment by the same act in such a form as to expressly include telephone corporations. The ultimate question in this case is whether this section grants any right to plaintiff in regard to the streets of the city of Los Angeles in addition to the rights therein granted by the act of Congress, which right so granted by the section has been accepted and is being exercised by plaintiff. If this question be answered in the affirmative, it is clear that plaintiff has under the section a right in the streets of the city of Los Angeles, in the nature of a franchise, granted by the state, constituting property assessable as other property in the place where it is situated. (*Stockton Gas etc. Co.* v.

*San Joaquin Co.,* 148 Cal. 318, [5 L. R. A. (N. S.) 174, 83 Pac. 54]. If, on the other hand, this question is answered in the negative, it appears necessarily to follow that plaintiff has no franchise granted by the state. The question of the effect of section 536 of the Civil Code with relation to telegraph corporations operating under the provisions of this act of Congress has never been determined by this court, except in so far as it was determined in *Western Union Tel. Co.* v. *Visalia,* 149 Cal. 744, [87 Pac. 1023]. In *San Francisco* v. *Western Union Tel. Co.,* 96 Cal. 140, [17 L. R. A. 301, 31 Pac. 10], it was assumed that the assessment was on the federal franchise, and it was one of the things taken as granted that the company "has derived no franchise from the state of California." In *Western Union Tel. Co.* v. *Visalia,* 149 Cal. 744, [87 Pac. 1023], the assessment was on "a franchise granted by the city of Visalia." The company had erected and was using its lines of poles and wires through what were afterwards streets of the city of Visalia before the city was incorporated, and had ever since used the same. The city of Visalia in the year 1892 purported to grant to the company by ordinance the right to use its streets for its poles and wires. The city was then existing under a special act of the legislature which made sections 4354 to 4456 of the Political Code a part of the charter. (Stats. 1873-4, p. 171.) The majority opinion (p. 751) held that in so far as the ordinance of Visalia purported to grant any rights, it merely attempted to give to plaintiff that which it already had and was of no legal effect whatever. It was not expressly decided by that opinion what was the source of the company's rights in that regard, the Federal Act or the state law. The opinion of Justice McFarland, concurred in by Justice Lorigan, did say that the company had the right to operate a telegraph line alone the streets of the city "not only from the act of Congress above referred to, but also from section 536 of our Civil Code," but there was no expression of opinion therein as to whether said section 536 granted any rights that were not already possessed by the company under the act of Congress. The case, however, did necessarily decide that in view of the act of Congress and section 536 of the Civil Code, the right of the company to use the streets of a city organized and existing under the general laws of the state relating to municipal corporations contained in section 4354

to 4456 of the Political Code, *where it had established its system therein prior to the incorporation of the city,* existed independently of any grant by the city, and that the city could not add to its right in that behalf. It also necessarily decided that if there was anything enjoyed by the company that was not covered by the act of Congress, its rights in that behalf were derived from section 536 of the Civil Code.

The question of the extent and character of the rights granted by the Federal Act is, of course, exclusively a federal question, upon which the decisions of the United States supreme court are necessarily final. There is apparently considerable difference in the views of learned counsel appearing in this case, and also in the views of different judges, both federal and state, as to the effect of various decisions of the United States supreme court touching this question. But we think there can reasonably be no difference of opinion as to the meaning of those decisions so far as all questions necessary to the determination of this case are concerned. It was clearly and definitely established by the decision of that court in *St. Louis* v. *Western Union Tel. Co.,* 148 U. S. 92, [13 Sup. Ct. 485, 37 L. Ed. 380], that the privilege conferred by the act of July 24, 1866, on telegraph companies to construct, maintain, and operate lines of telegraph over such post roads as are public streets or highways of a state, is subject to the right of the state to charge and receive compensation from the telegraph company for the use by it of so much of the street or highway as is exclusively devoted to its purposes. That case involved the validity of a charge imposed by the city of St. Louis, held to represent the state, upon telegraph companies, for the privilege of using the streets of the city of a certain amount per annum for each pole erected or used by them in such streets, and the right to impose such a charge, held to be in the nature of rental for the use of property belonging to the city, was upheld. The court having considered the nature of the use made by the company, showing that such use differed from that of the general public, which was temporary and shifting, in that it is "in respect to so much of the space as it occupies with its poles, permanent and exclusive," effectually and permanently dispossessing the general public as if it had destroyed that amount of ground, proceeded to consider the claim of the telegraph company that, by reason

of the provisions of the act of July 24, 1866, it had the right to so occupy the streets with its poles free of charge on the part of the state or city. Upon this point the court, after declaring that it is a misconception to suppose that the franchise or privilege granted by the act of 1866 carries with it the unrestricted right to appropriate the public property of a state, and that a grant from one government cannot abridge any property rights of a public character created by the authority of another sovereignty, said:

"No one would suppose that a franchise from the federal government to a corporation, state or national, to construct interstate roads or lines of travel, transportation or communication, would authorize it to enter upon the private property of an individual, and appropriate it without compensation. No matter how broad and comprehensive might be the terms in which the franchise was granted, it would be confessedly subordinate to the right of the individual not to be deprived of his property without just compensation. And the principle is the same when, under the grant of a franchise from the national government, a corporation assumes to enter upon property of a public nature belonging to a state. It would not be claimed, for instance, that under a franchise from Congress to construct and operate an interstate railroad the grantee thereof could enter upon the state-house grounds of the state, and construct its depot there, without paying the value of the property thus appropriated. Although the state-house grounds be property devoted to public uses, it is property devoted to the public uses of the state, and property whose ownership and control are in the state, and it is not within the competency of the national government to dispossess the state of such control and use, or appropriate the same to its own benefit, or the benefit of any of its corporations or grantees, without suitable compensation to the state. This rule extends to streets and highways; they are the public property of the state. While for purposes of travel and common use they are open to the citizens of every state alike, and no state can by its legislation deprive the citizens of another state of such common use, yet when an appropriation of any part of this public property to an exclusive use is sought, whether by a citizen or corporation of the same or another state, or a corporation of the national government, it is within

the competency of the state, representing the sovereignty of
that local public, to exact for its benefit compensation for this
exclusive appropriation.  It matters not for what that exclu-
sive appropriation is taken, whether for steam railroads or
street railroads, telegraphs or telephones, the state may if it
chooses exact from the party or corporation given such exclu-
sive use pecuniary compensation to the general  public for
being deprived of the common use of the portion thus appro-
priated."

These views were reaffirmed and applied in *Postal Tel. Co.*
v. *Baltimore,* 156 U. S. 210, [15 Sup. Ct. 356, 39 L. Ed. 399],
and approved in *Richmond* v. *Southern Bell T. & T. Co.,* 174
U. S. 771, [19 Sup. Ct. 778, 43 L. Ed. 1162], and they have
not been modified by any subsequent decision.  It thus appears
to be settled by the decisions of the court of last resort on such
questions, that even if a state has no power to absolutely pro-
hibit such exclusive use of portions of its public highway by
a telegraph company operating under said act (see, however,
*Western Union Tel. Co.* v. *Pennsylvania etc. Co.,* 195 U. S.
540, [25 Sup. Ct. 133, 49 L. Ed. 312]), it nevertheless has a
property interest in its public highways which is not divested
by a grant of the United States to the telegraph company, and
which may be the subject of grant from the state to the com-
pany.  Notwithstanding the act of Congress, the telegraph
company cannot appropriate to its exclusive use portions of
such highways without being subject to charges on behalf of
the state by way of compensation for such use.  It is obvious,
then, that if the state grants to such a company the right to
such exclusive possession of portions of its public highways
without compensation, the company obtains thereby something
not acquired by it under the act of Congress, and that such
right so acquired by the company is nothing more nor less
than a franchise, within a well-recognized meaning of that
term, granted by the state, having for purposes of assessment
a local *situs,* and being assessable in the particular city or
county in which the streets so occupied are situated.  (*Stock-
ton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 318, [5 L. R. A. (N.
S.) 174, 83 Pac. 54].)  It is also clear that where there is a
valid law of the state purporting to grant such right to tele-
graph companies generally, the exclusive occupation by a
company of portions of public highways for the authorized

purposes is an acceptance by it of the offered franchise. (*Stockton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 318, [5 L. R. A. (N. S.) 174, 83 Pac. 54].)

In the light of what we have said, it appears that the case of *Western Union Tel. Co.* v. *Visalia,* 149 Cal. 744, [87 Pac. 1023], does necessarily decide that section 536 of the Civil Code was effectual to grant this right as to all highways lying outside of municipalities, and that where such a grant was accepted by a company the subsequent inclusion of a highway so occupied by a municipality existing under such laws relating to municipal corporations as were contained in sections 4354 to 4456 of the Political Code, would not operate to impair the effect of such grant. Section 536 of the Civil Code has, however, never been confined in terms to highways outside of municipalities, but always purported to apply to all public highways in the state. The term "public highways" includes streets in cities. (Pol. Code, sec. 2618.) It is not claimed that at any time prior to the construction of its telegraph system by plaintiff in the city of Los Angeles, the state had vested in that municipality any right of control over public highways therein, except in so far as the legislature had empowered the common council of any city, among other things, "to regulate the streets, wharves, piers, and chutes in the city and the use thereof." (Pol. Code, sec. 4408.) Manifestly this provision when considered in connection with section 536 of the Civil Code, adopted at the same time, cannot be construed as conferring any greater power than that of doing such things in regard to the streets and the use thereof as were justified in the legitimate exercise of the police power, and would not have warranted the municipality in attempting to exclude a telegraph company from such use of its streets as was expressly authorized by section 536 of the Civil Code, or in exacting compensation for such use. It warranted such regulation of the use as was incident to a proper exercise of the police power, and nothing more. It is universally recognized that the state in its sovereign capacity has the original right to control all public streets and highways, and that except in so far as that control is relinquished to municipalities by the state, either by provision of the state constitution or by legislative act not inconsistent with the constitution, it remains with the state legislature to be exercised in any manner not

prohibited by the state constitution. From what we have said it is apparent that the case of *Western Union Tel. Co.* v. *Visalia,* 149 Cal. 744, [87 Pac. 1023], necessarily determined material questions arising in this case in such a manner as to sustain the validity of the assessment involved. In other words: If that decision is to be followed, section 536 of the Civil Code constituted a grant to telegraph companies of rights in regard to the streets of cities, in addition to the rights given by the act of Congress, which to the extent that they were accepted and availed of by any company, constituted a franchise granted by the state and accepted by the company. This so-called state franchise included the right to such exclusive occupation by the company of portions of the streets as is maintained for the purpose of its system, leaving nothing in that behalf to be granted by the municipality. Under that decision, so far as the telegraph company holds these rights, it holds them solely under and by virtue of section 536 of the Civil Code. It is proper to say that there is no question in this case of any attempted revocation or modification by either state or city of any privilege purported to be granted by the state to plaintiff, and that the city of Los Angeles has never purported to grant any of such privileges to plaintiff, but has apparently acquiesced in the claim of plaintiff that it is entitled to use its streets, subject only to the lawful exercise by the city of such rights in regard to such use as it has under the police power. What those rights are is a question in no way involved in this case.

It is earnestly urged by counsel appearing as *amici curiæ,* that section 536 of the Civil Code is either unconstitutional or cannot be construed as it was in the Visalia case, and that if neither of these contentions be upheld, it nevertheless must be held that the section has been repealed by implication so far as the city of Los Angeles is concerned. As to the latter claim, it is sufficient to say that none of the laws upon which the claim of repeal by implication is based was enacted prior to 1883, which was long after the construction of plaintiff's system along the streets of the city of Los Angeles. Assuming that section 536 of the Civil Code was a grant of the right to such use of the streets, we are of the opinion that it must be held, to use the language of the United States circuit court of appeals in *Sunset Tel. & Tel. Co.* v. *Pomona,* 172 Fed. 837,

[97 C. C. A. 251], that the maintenance and operation of such system "was an acceptance by it of the provisions of that statute, which thereby became a contract between the company and the state, secured by the constitution of the United States against impairment by any subsequent state legislation." In this connection it should be said that learned counsel for plaintiff assert that inasmuch as it constructed its lines in the streets of Los Angeles in the year 1870, prior to the adoption of section 536 of the Civil Code, it never manifested any acceptance of the rights offered by the statute and has exercised no franchise thereunder. Of course, the grant of the right to "construct" and "erect" contained in the section necessarily implied the right to maintain. Although the construction was before the adoption of the Civil Code section, the continued maintenance of exclusive possession of portions of highways without compensation was a sufficient acceptance. It once being established that the act of Congress did not give the right to such exclusive possession without compensation, the maintenance of such possession by plaintiff was necessarily under the Civil Code section, and cannot be attributed to any other authority.

Returning to the points made as to the proper construction of section 536 of the Civil Code, and its constitutionality if it be given the effect attributed to it in the Visalia case: While there is some conflict in the authorities cited from other states, we are of the opinion that the weight of authority and the better reasoning support the construction given by the Visalia case, viz.: that the section was a grant by the state to all telegraph corporations accepting the same, of the rights therein specified. The reasons given by learned counsel in support of a contrary construction do not appeal to us as having much force in the face of the clear and unambiguous language used. And to the extent that the offer of the state contained in the section was accepted by a telegraph company by actual occupation of a highway prior to any repeal, modification, or suspension of the section, no right of revocation having been reserved, such telegraph company has vested rights that cannot be taken away by state or city without compensation.

In this connection, learned counsel claim that a right to revocation was reserved, basing their claim on the constitu-

tional provision that all laws passed pursuant to the section providing for the formation of corporations may be altered from time to time or repealed (Const. of 1849, sec. 31, art. IV; Const. of 1879, sec. 1, art. XII), and on section 327 of the Political Code, providing that a statute may be repealed at any time except when otherwise provided therein, and that persons acting thereunder are deemed to have acted in contemplation of this power of repeal. The effect of similar provisions was learnedly discussed by Justice Cooley in *City of Detroit* v. *Detroit etc. Co.*, 43 Mich. 140, [5 N. W. 275], where it was sought, under express authority of an act of the legislature of the state, to deprive a plank road company of its right acquired under a prior statute to maintain a toll-gate within the existing corporate limits of the city of Detroit. It was there concluded that the effect would be to deprive the company of property lawfully acquired, and that there was no well considered case in which it had been held that a legislature, under the general power to amend a charter, might take from a corporation any of its substantial property or property rights. A distinction is made in the opinion between the cases involving the question of the liability of corporations to the control of the general police laws and cases involving acts passed solely in the exercise of the reserved general power to amend and repeal charters of corporations. Of course, the liability of plaintiff to all such reasonable regulations as is warranted in the proper exercise of the police power cannot be disputed. In fact this is expressly stipulated by the provisions in section 536 of the Civil Code, that the system of the telegraph company must be constructed "in such manner and at such points as not to incommode the public use of the road or highway." But in so far as actual occupation of a highway by a telegraph company was taken or had under section 536 of the Civil Code, we are of the opinion that a vested right resulted, subject only to the proper exercise of the police power, and that it must be held that there was no such reservation as warranted such right being taken away without compensation.

We are satisfied, too, that there was nothing in the old constitution of this state, which was in force at the time of the adoption of the codes and up to the year 1880, that prohibited the granting of such rights to telegraph corporations. The

only provision referred to by learned counsel is section 11 of article I of that constitution, which provided that "all laws of a general nature shall have a uniform operation." We do not see that this provision is at all applicable. The claim is that the grant made by section 536 of the Civil Code is void because it is limited to "corporations," and does not include natural persons or partnerships. It is not to be doubted that a grant of such rights to a single telegraph corporation would have been valid under the old constitution, which contained no inhibition whatever against special legislation. Section 536 was such a grant to all corporations, and was no more objectionable so far as legal prohibition is concerned, than a grant to a single corporation. But we are not prepared to hold that the section is violative of the provisions of our present constitution relating to special legislation. We may reasonably assume that good and sufficient reasons may be apparent to the legislature why the right to exclusively occupy portions of the public highways for the purposes specified should be confined to corporations organized and existing for the purpose of doing a telegraph business, and why such corporations constitute a class to which such a grant may properly be restricted without violating our constitutional provisions against special legislation. If it may reasonably be so assumed the legislation must be upheld, for it is well settled that to warrant a court in adjudging legislation void on this ground it must clearly appear that there was no sufficient reason to warrant the legislative department in finding a difference and making the discrimination. Every presumption is in favor of the validity of an act of the legislature, until its invalidity is made to appear. (See *Ex parte King,* 157 Cal. 161, [106 Pac. 578], and cases there cited.)

It is suggested that section 536 of the Civil Code was repealed upon the adoption of the constitution of 1879 by reason of section 6 of article XII, contained therein, declaring that "all existing charters, grants, franchises, special or exclusive privileges, under which an actual and *bona fide* organization shall not have taken place, and business been commenced in good faith, at the time of the adoption of this constitution, shall thereafter have no validity." As we have seen, the repeal of section 536 of the Civil Code, even by a constitutional provision, could not be held to have affected the rights of

plaintiff in so far as it had already acquired vested rights under section 536. But we are satisfied that this provision of the constitution cannot reasonably be construed as affecting section 536 of the Civil Code, at all. So far as any company had not at such time availed itself of and thus accepted the provisions of section 536, there was no "existing" grant or franchise to be annulled, and there was never any "special or exclusive" privilege given by the section. The constitutional provision in question was in no way applicable.

It follows from what we have said that plaintiff's exclusive occupation of portions of the streets of the city of Los Angeles without liability for compensation, to the extent at least to which its system was constructed therein at the time of the adoption of section 536 of the Civil Code, and its right to such occupation free of charge by the city, are based solely on the last named section, and that as to such occupation and right this section constitutes a grant in the nature of a franchise accepted by it, constituting property located within this state and assessable in the county of Los Angeles. The claim of plaintiff that taxation of this franchise is in any way taxation of its federal franchise is utterly without basis. The tax is one solely on valuable property within this state, viz., the right to the permanent and exclusive use of portions of the public streets of the city of Los Angeles, free of compensation—a tax differing in no material respect from one levied on its poles and wires located within such city. (See, generally, *Central Pacific R. R. Co.* v. *California*, 162 U. S. 91, 118, [16 Sup. Ct. 766, 40 L. Ed. 903].)

No other point is made against the validity of the assessment here involved. There is, of course, no question presented by this record as to the correctness of the valuation placed upon the property by the assessor.

The judgment is reversed.

Sloss, J., Lorigan, J., Henshaw, J., and Melvin, J., concurred.

Mr. Justice Shaw deems himself disqualified to act in this case, by reason of relationship to one of the attorneys of record.

[L. A. No. 2446.   In Bank.—June 5, 1911.]

## WESTERN UNION TELEGRAPH COMPANY (a Corporation), Respondent, v. COUNTY OF LOS ANGELES, Appellant.

TELEGRAPH COMPANY—STATE FRANCHISE—TAXATION OF BY STATE.— *Western Union Telegraph Co.* v. *Hopkins,* (L. A. No. 2445), *ante,* p. 106, affirmed to the effect that, at the time of the assessment in question, the plaintiff had a right in the nature of a franchise in the streets of the city of Los Angeles—viz., the right to the exclusive occupation without compensation of portions thereof used for its poles and wires and underground conduit, derived from and held under section 536 of the Civil Code; that such franchise constituted no part of its federal franchise, and was taxable for state and county purposes in the county of Los Angeles.

ID.—DESCRIPTION OF FRANCHISE IN ASSESSMENT—FEDERAL FRANCHISE EXCLUDED.—A description of property assessed to a telegraph company, as the "Right to occupy the streets of the city of Los Angeles," without other words of description or identification, must be construed as limited to rights in the streets of Los Angeles derived by the telegraph company from the state of California and not covered by its federal franchise. Such description is not so imperfect as to invalidate the assessment.

ID.—PRESUMPTION IN FAVOR OF ASSESSMENT—NON-ASSESSABLE PROPERTY EXCLUDED.—It will not be assumed, in the absence of evidence, that the assessor included in such assessment, which in express terms includes the rights granted by the state, other property which he had no right or power to assess.

ID.—ASSESSMENT PRESUMED VALID.—The presumption is always in favor of the validity of an assessment, and the burden of showing the contrary is on the person claiming to be aggrieved.

ID.—REGULAR PERFORMANCE OF OFFICIAL DUTY—PRESUMPTION APPLIES TO OFFICIAL ACTION IN TAX MATTERS.—Independent of special statutory provisions relative to presumptions in favor of assessments, the general presumption that public officers have regularly performed their duties, and that official duty has been regularly performed, applies to official action in tax matters.

ID.—ASSESSMENT AGAINST OWNER OF DIFFERENT FRANCHISES.—Where the taxpayer has two franchises, one taxable by the state and one not so·taxable, an assessment simply of "franchise," without other words of description or identification, is not invalid for want of a proper description.

APPEAL from a judgment of the Superior Court of Los Angeles County.   George H. Hutton, Judge.

The facts are stated in the opinion of the court.

J. D. Fredericks, District Atttorney, and Hartley Shaw, Chief Deputy, for Appellant.

J. P. Wood, City Attorney, and Wm. J. Carr, Assistant City Attorney, *Amici Curiæ,* for City of Pasadena.

Beverly L. Hodghead, and Brown & Wells, for Respondent.

ANGELLOTTI, J.—This is an action by plaintiff to recover five hundred and fifty dollars taxes for the fiscal year ending June 30, 1907, paid under protest.   Judgment was in favor of plaintiff and defendant appeals therefrom.   Except that the taxes were for a different year, the material facts are the same as were the facts in the case of *Western Union Telegraph Co.* v. *Hopkins,* (L. A. 2445), *ante,* p. 106, [116 Pac. 557], this day decided, with the single exception that the description of the property assessed in the case at bar is: "Right to occupy the streets of the city of Los Angeles," without other words of description or identification, the valuation thereof for purposes of assessment being placed at fifty thousand dollars.

By *Western Union Tel. Co.* v. *Hopkins,* (L. A. 2445), *ante,* p. 106, [116 Pac. 557], it is decided that plaintiff had, at the time of this assessment, a right in the nature of a franchise in the streets of the city of Los Angeles, viz.: the right to the exclusive occupation without compensation of portions thereof used for its poles and wires and underground conduit, derived from and held under section 536 of the Civil Code, which constituted no part of its federal franchise, and which was taxable for state and county purposes in the county of Los Angeles.   If the assessment in the case at bar was exclusively of that right, it follows from the views announced in that case that the tax was valid.   The only difficulty in this case arises from the wording of the description in the assessment.   It is admitted that plaintiff has certain rights in regard to the streets of the city of Los Angeles by virtue of its federal franchise acquired under the act of July 24, 1866, and, of course, that franchise cannot be assessed by state, county, or

municipality. It is claimed by plaintiff that its federal franchise is included in this assessment, and if so included that the entire assessment must fall as illegal, because the values of the two rights, federal and state, are so blended together that the unlawful part cannot be separated from the lawful part. If the first of these claims is well founded, the second necessarily follows. (*California* v. *C. P. R. R. Co.*, 127 U. S. 1, 29, 45, [8 Sup. Ct. 1073, 32 L. Ed. 150].) Plaintiff alleged in its complaint that the assessment was upon its federal franchise. By its answer defendant fully denied the allegations in this behalf, denying that the assessment was intended to or did impose any burden or tax on any federal franchise, and alleging that the only franchise or right assessed was that derived by plaintiff from the state of California, under section 536 of the Civil Code. No evidence was introduced by either side on this issue, the case being submitted for decision upon the pleadings and upon a stipulation as to the facts, which stipulation is silent upon this proposition. There were no findings of fact.

We are satisfied that it must here be held that the assessment was limited to rights in the streets of Los Angeles derived by plaintiff from the state of California and not covered by the federal franchise, and that the description was not so imperfect as to invalidate the assessment. Under the views announced in *Western Union Tel. Co.* v. *Hopkins*, (L. A. 2445), *ante*, p. 106, [116 Pac. 557], the pleadings and stipulated facts in this case show that plaintiff owned certain rights of occupation in regard to the streets of Los Angeles that were derived from the state of California and were not included in the federal franchise. These constituted taxable property which it was the duty of the assessor to assess. (Pol. Code, sec. 3628.) It is not to be assumed in the absence of evidence that the assessor has included in this assessment, which in express terms certainly includes plaintiff's rights granted by the state, other property which he had no right or power to assess. The wording of the description does not necessarily imply the inclusion of any such property, but is entirely consistent with the idea that the thing assessed was the right of exclusive occupation without compensation of portions of the public streets of Los Angeles, granted by the state and owned by plaintiff. It cannot be doubted that the presumption is always

in favor of the validity of an assessment, and that the burden of showing the contrary is on the person claiming to be aggrieved. Independent of special statutory provisions relative to presumptions in favor of assessments, the general presumption that public officers have regularly performed their duties and that official duty has been regularly performed (Code Civ. Proc., subd. 15, sec. 1963), applies to official action in tax matters. (1 Cooley on Taxation, 3d ed., p. 447, and note.) "The presumption in all proceedings relating to taxes is in favor of regularity." (*Chamberlain* v. *City of St. Ignace,* 92 Mich. 335, [52 N. W. 635].) In *People* v. *Central Pacific R. R. Co.,* 105 Cal. 576, [38 Pac. 955], the assessment was upon the "franchise" of the defendant. It was claimed by the defendant in that case that the assessment was void because it included its franchise received from the United States. The court said: "We have seen that the state franchise is property susceptible of valuation, and, as the state board of equalization is directed to assess the franchise of the appellant, it must be assumed, in the absence of any other evidence than the assessment itself, that the board has acted upon property within its jurisdiction, rather than upon property which it has no power to include in the assessment." In that case there was a finding of the trial court that the federal franchise was not included, and it was said that section 3670 of the Political Code, a section not materially differing in its provisions from those of section 3789 of the Political Code as to the effect of the assessment-book or delinquent roll as *prima facie* evidence, would sufficiently sustain this finding, even if there were no other evidence. These views so expressed are assailed as *dicta,* because in that case there was other evidence which the court considered and held sufficient to sustain the finding. If we assume them to have been *dicta,* we nevertheless are of the opinion that they are correct. There is nothing in *California* v. *Central Pacific R. R. Co.,* 127 U. S. 1, [8 Sup. Ct. 1073, 32 L. Ed. 150], opposed to this conclusion. In that case, according to the opinion of the United States supreme court, there was a finding of the trial court that the assessment made by the state board of equalization included the full value of *all* franchises and corporate powers held and exercised by the defendant, which necessarily included its federal franchise. The court assumed this finding to be correct, and proceeding

upon that assumption considered the questions whether the defendant held any federal franchise, and whether such a federal franchise was assessable by the state. In a later case, *Central Pacific R. R. Co.* v. *California,* 162 U. S. 91, [16 Sup. Ct. 766, 40 L. Ed. 903], being the same case reported in 105 Cal. 576, [38 Pac. 905], which was taken by writ of error to the United States supreme court, the same court sustained a similar assessment of "franchise," upon the finding by the trial court that the assessment was only upon the state franchise and did not include the federal franchise. The two decisions in this case, that of the supreme court of the United States and that of the supreme court of California, are certainly authority upon the proposition that where the taxpayer has two franchises, one taxable by the state and one not so taxable, an assessment simply of "franchise" without other words of description or identification, is not invalid for want of a proper description. (See, also, *Stockton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 313, 5 L. R. A. (N. S.) 174, [83 Pac. 54], and *San Francisco* v. *Oakland Water Co.,* 148 Cal. 331, [83 Pac. 61].) The opinion in the case of *San Francisco* v. *Western Union Tel. Co.,* 96 Cal. 140, 17 L. R. A. 301, [31 Pac. 10], is not in point for the reason that it was there assumed, in accord with an undisputed finding or stipulation of the parties, that the company "has derived no franchise" from the state of California, and the court considered only the question of the right to assess the federal franchise. The question presented is very different from that of a description of land in an assessment, of such a nature that it could apply to either of two parcels equally within the jurisdiction of the assessor, and the authorities cited on that proposition are not applicable in this controversy. In the absence of any showing to the contrary the presumption that the assessing authorities in assessing plaintiff's franchise have included only property within their jurisdiction obtains, and sufficiently identifies the particular franchise assessed.

From what we have said it follows that the assessment must be held valid.

The judgment is reversed.

Sloss, J., Lorigan, J., Henshaw, J., and Melvin, J., concurred.

Mr. Justice Shaw deems himself disqualified to act in this case, by reason of relationship to one of the attorneys of record.

---

[L. A. No. 2559.  In Bank.—June 5, 1911.]

POSTAL TELEGRAPH CABLE COMPANY (a Corporation), Respondent, v. COUNTY OF LOS ANGELES, Appellant.

TELEGRAPH COMPANIES—STATE FRANCHISE—TAXATION OF BY STATE.—
*Western Union Telegraph Company* v. *County of Los Angeles*, (L. A. No. 2446), *ante*, p. 124, approved and followed.

ID.—TELEGRAPH SYSTEM INSTALLED IN LOS ANGELES IN 1889—SECTION 536 OF CIVIL CODE NOT IMPLIEDLY REPEALED.—There is no statute of this state enacted prior to the construction of plaintiff's telegraph system in the city of Los Angeles in the year 1889 which impliedly repealed or suspended, so far as that city is concerned, the effect of section 536 of the Civil Code, granting to telegraph companies a state franchise to use public roads.

ID.—MUNICIPAL CORPORATION ACT OF 1883 NOT APPLICABLE TO LOS ANGELES.—The provisions of the general Municipal Corporation Act of 1883 relating to the powers of boards of trustees and city councils of towns and cities existing thereunder, in regard to the control and regulation of streets therein, did not have such effect. Such act was never applicable to the city of Los Angeles, because it never organized thereunder.

ID.—EFFECT OF FREEHOLDERS' CHARTER—SECTION OF CIVIL CODE A GENERAL LAW.—No provisions of the freeholders' charter of the city of Los Angeles, as it existed at the time of its approval on January 31, 1889, could impair the effect of section 536 of the Civil Code, which was a general law.

ID.—EFFECT OF STATUTES ENACTED SUBSEQUENT TO INSTALLATION OF TELEGRAPH SYSTEM.—The plaintiff's telegraph system having been installed in the city of Los Angeles during the year 1889, the state franchise thus acquired by it under and by virtue of section 536 of the Civil Code, was not affected by any effect the so-called franchise act of 1893, or any subsequent act may have had on that section.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

J. D. Fredericks, District Attorney, and Hartley Shaw, Chief Deputy, for Appellant.

Hunsaker & Britt, and Lloyd & Wood, for Respondent.

ANGELLOTTI, J.—This like the action of *Western Union Tel. Co.* v. *County of Los Angeles,* (L. A. No. 2446), *ante,* p. 124, [116 Pac. 564], is an action to recover taxes paid by plaintiff under protest for the fiscal year ending June 30, 1907, upon an assessment upon its "right to occupy the streets of the city of Los Angeles," the assessment valuation being thirty thousand dollars, and the tax thereon $330. Plaintiff had judgment and defendant appeals from such judgment.

There is no material difference between this case and the Western Union Telegraph Company case just referred to. This plaintiff, a telegraph company organized in the year 1886 under the laws of the state of New York, accepted the terms of the act of Congress of July 24, 1866, [14 Stats. 221], on April 16, 1886, and did not construct its system in the city of Los Angeles until the year 1889, at which time that city had become organized under its freeholders' charter approved by the state legislature January 31, 1889. (Stats. 1889, p. 455.) This difference, however, is not material. There was no express repeal of section 536 of the Civil Code until the year 1905, when that section was repealed and immediately re-enacted with express provision for telephone companies, and we have found no statute enacted prior to the construction of plaintiff's system in the city of Los Angeles that can be held to have impliedly repealed or suspended the effect of that section so far as that city is concerned. Provisions of the general Municipal Corporation Act of 1883 relating to the powers of boards of trustees and city councils of towns and cities existing thereunder in regard to the control and regulation of streets therein, referred to by *amici curiæ,* cannot be given such effect. Howsoever they may be construed, they were never applicable to the city of Los Angeles, for that city was never organized under the general Municipal Corporation Act. Up to the time of the going into effect of its freeholders' charter it existed under a special legislative charter, containing no

such provisions as those in the general Municipal Corporation Act that are so referred to. It is immaterial also in this case what construction be given to certain provisions of the free-holders' charter as they existed at the time of its approval in 1889. However they be construed, they could not impair the effect of section 536 of the Civil Code, which was a general law. (See Const., art. XI, sec. 6; Const., art. XI, sec. 8, as amended in 1887; *Davies* v. *City of Los Angeles,* 86 Cal. 37, [24 Pac. 771]; *Banaz* v. *Smith,* 133 Cal. 102, 104, [65 Pac. 309].) It is to be borne in mind that the "municipal affairs" amendment of section 6 of article XI of the constitution was not adopted until the year 1896. Nor is it necessary in this case to consider the effect on section 536 of the Civil Code of the so-called franchise act of 1893, [Stats. 1893, p. 288], or any subsequent act, as the system of plaintiff was installed in the city of Los Angeles during the year 1889.

In view of the considerations stated above, this case is governed by the case of *Western Union Tel. Co.* v. *County of Los Angeles,* (L. A. No. 2446), *ante,* p. 124, [116 Pac. 564].

The judgment is reversed.

Sloss, J., Lorigan, J., Henshaw, J., and Melvin, J., concurred.

Mr. Justice Shaw deems himself disqualified to act in this case, by reason of relationship to one of the attorneys of record.

---

[Sac. No. 1766. Department Two.—June 6, 1911.]

## H. J. VAN NESS, Respondent, v. JOHN ROONEY et al., Appellants.

PUBLIC LANDS—POLICY OF UNITED STATES RESPECTING MINERAL LANDS —RESERVATION FROM ORDINARY SALE.—From its inception, it has been the policy of the United States government to retain the mineral lands of the United States for mining purposes, and not to allow title to them to pass to pre-emptors, homesteaders, timber applicants, grantees under wagon road or railroad grants, or in any case save where patents were secured in pursuance of the provisions permitting the purchase directly of mineral lands.

ID.—LOCATOR NEED NOT APPLY FOR PATENT—MINERAL CLAIMS ARE
PROPERTY—RIGHT OF EXCLUSIVE POSSESSION.—No provision has
ever been enacted in the mining laws of the United States com-
pelling a locator of a mining claim to patent his claim. Such
claims on public land are property in the fullest sense of the word,
and a valid location thereof, made and kept up in accordance with
the statute, has the effect of a grant by the United States of the
right of present and exclusive possession of the lands located.

ID.—RAILROAD GRANT—LOCATION OF MINERAL LAND PRIOR TO PATENT.—
Mineral lands situated within the limits of railroad grants are sub-
ject to location up to the time of the issuance of the patent.

ID.—ACTION TO ANNUL PATENT TO RAILROAD—QUIETING TITLE TO MIN-
ERAL LAND EXCEPTED FROM PATENT.—The act of Congress of March
2, 1896, prohibiting the bringing of actions by the United States to
annul patents theretofore erroneously issued under railroad and
wagon-road grants, after five years from the time of the passage of
that act, does not debar one who has made a valid location of mineral
land within the limits of a railroad grant, prior to the issuance of a
patent therefor, which on its face expressly excluded and excepted
from the lands granted all mineral lands found to be in the tracts
described in the granting clause of the patent, from maintaining
an action to quiet his title to his mineral claim after the expiration
of such time. Such action is not one to annul or avoid a patent
issued by the government of the United States, and the relief sought,
if granted, would not invalidate such patent, but would merely, by
interpreting the instrument, determine whether the mining claim
was included in the reserving clause of the patent.

ID.—EFFECT OF EXCEPTION OF MINERAL LAND IN PATENT TO RAILROAD.—
A patent for land included in a railroad grant, which expressly ex-
cludes and excepts from the lands described in the granting clause
"all mineral lands should any such be found in the tracts aforesaid,"
does not pass title to a mineral claim included therein, which had
been duly and legally located prior to the issuance of the patent.

ID.—DETERMINATION OF CHARACTER OF LAND—DUTY OF LAND DEPART-
MENT—EFFECT OF PATENT—LANDS KNOWN TO BE MINERAL.—The
determination of the question whether public lands are mineral, and
thus reserved under the provisions of the general law from sale,
or agricultural or other lands of which it may make disposition,
being given to the land department, the general rule is, that the
issuance of a patent is a conclusive determination that the land is
agricultural or such other character as might be disposed of under
the general law providing for the disposition of public lands and
not mineral land reserved from sale, and the effect of the issuance of
a patent to the land as agricultural is to transfer to the patentee all
mineral deposits which may be subsequently discovered within its
boundaries but which were not known to exist at the time the patent
was issued. The rule, however, is equally well established that

mineral deposits known to exist in the land at the time the patent
was issued do not pass under it.

ID.—QUIETING TITLE—LOCATOR MAY MAINTAIN ACTION.—One in pos-
session of a mining claim situated within the limits of a railroad
grant, under a valid location made prior to the issuance of a patent
to the railroad, is in privity with the United States, and although
he holds a mere equitable title, may have the same quieted against
a grantee of the railroad, asserting title under such patent.

APPEAL from an order of the Superior Court of Trinity
County refusing a new trial.  James W. Bartlett, Judge.

The facts are stated in the opinion of the court.

J. D. Hall, and Taylor & Tebbe, for Appellants.

Braynard & Kimball, for Respondent.

LORIGAN, J.—This action was brought by plaintiff against
defendants to quiet his title to a quartz mining claim known
as the "Five Pines Mine" located in Trinity County, and for
an injunction restraining defendants from trespassing on or
extracting ore therefrom.  Plaintiff proved a valid location of
the mine by one Edwin Baker on August 26, 1895, and a con-
veyance by said locator to plaintiff; that the claim consisted
of a piece of land fifteen hundred feet long by six hundred feet
wide located partly in section 20 and partly in section 29, town-
ship 35 north, range 7 west, M. D. M., about half the surface
ground of said claim lying in each of said sections; that the
annual work and labor required by law to be done had been
performed on said claim each year after its location, and that
the claim embraced valuable gold-bearing ore and contained
no deposits of coal or iron.

The defendants asserted title to that portion of the mining
claim located in section 29 as successors in interest under a
patent issued by the United States to the Central Pacific Rail-
road Company, dated February 14, 1896.  This patent pur-
ported to convey to said railroad company some two hundred
thousand acres of land in various sections, townships, and
ranges in California, including all of said section 29.  The
descriptive calls in the patent are followed by the granting
clause whereby the United States grants to the Central Pacific

Railroad Company "all the tracts of land described in the foregoing, yet excluding and excepting all mineral lands should any such be found in the tracts aforesaid, but this exclusion and exception according to the terms of the statute shall not be construed to include coal and iron lands."

Judgment was entered in favor of plaintiff declaring him to be the owner and entitled to the possession of the mining ground in question against every one except the government of the United States; that defendants had no right or title to any part thereof, and enjoined them from trespassing upon the property. Defendants moved for a new trial, which being denied, this appeal is taken solely from the denial of said order.

The judge of the superior court of Trinity County—Hon. J. W. Bartlett—before whom this cause was tried, in ordering judgment for plaintiff filed a written opinion in which he set forth so clearly the questions involved in the suit with accurate declarations of law bearing on them, that we quote from it extensively.

After referring to the facts, as we have recited them above, including the terms of the patent to the Railroad Company and the exceptions contained therein, the opinion of said superior judge proceeds:

"What if any is the effect of the exception and reservation above set forth in said patent is determinative of the issues involved in this case. Plaintiff's claim is that by virtue of this exception and reservation no title passed by the patent to that portion of the 'Five Pines Mine' which lies within that portion of said section 29 of township 35 north, range 7 west, M. D. M., to which defendants allege title. Defendants claim that plaintiff is debarred from making this claim by reason of the provisions of the act of Congress of March 2d, 1896, which prohibits the bringing of actions by the United States to annul patents theretofore erroneously issued under railroad or wagon road grants, after five years from the time of the passage of said act of Congress; that this action is an unauthorized attack upon a United States patent, and that if plaintiff was ever in a position to question the validity of the passing under said patent of the title to said section 29 he has lost his rights by not bringing his action within five years from the time the patent was issued. Defendants also claim that the excepting

clause is inserted in the patent without any authority of law and is void and of no effect.

"These questions are of momentous importance for on their proper solution depends the validity of titles of locators on much of the mineral lands in the mining districts of Trinity County and in other of the mining counties of the state of California. While a great number of authorities on questions relating to the scope and effect of patents issued by authorized officers of the Government of the United States were cited in the argument of counsel at the trial of this action, none have been presented, and after much research this court has not as yet found any decision of United States supreme court, federal court, or state supreme court, clearly or directly determining the questions urged by defendants, and in this action it is compelled to solve those matters largely through a construction and application of the United States statutes governing the transfers of public lands and those governing the locating and holding of mining claims situate on the public domain.

"From its inception it has been the policy of the United States government to retain the mineral lands of the United States for mining purposes, and not to allow title to them to pass to pre-emptors, homesteaders, timber applicants, grantees under wagon road or railroad grants, or in any case save where patents were secured in pursuance of the provisions permitting the purchase directly of mineral lands. This is evidenced by all the statutes of the United States relating in any way to the disposal of public lands, by the requirements in final proofs when made by claimants for any variety of land, and by various resolutions of the Congress of the United States declaring that mineral lands were not intended to be granted under the guise of grants in aid of the construction of wagon roads and railways. In the recitals of the patent involved in the case at bar it is specified that the act under which the patent is issued does not pass mineral lands, and the exception and reservation in question indicate that the officers authorized to make disposition of the lands by patent were desirous of preserving for the people of the United States any mineral lands that might be found in the large portion of the public domain which was being given for all time into the hands of a private corporation.

"By the mining statutes of the United States passed in 1866

the right of entering upon and locating and appropriating lands valuable for their mineral deposits was conferred upon every citizen of the United States and those who might declare their intention to become such citizens. By the discovery of mineral and marking of boundaries and compliance with such rules as local mining districts or state legislatures might enact not to conflict with the United States laws, the locator of a quartz mining claim was given the exclusive right to the possession of the lands and the mineral therein contained within the boundaries of his claim. Only one condition was imposed upon him and that was in every calendar year he must perform in work and labor and improvements upon his mine at least one hundred dollars in value. If he did not do this he was liable to lose his mine, in the event some other qualified locator made a location of the claim before the original locator had resumed work. His claim did not become forfeited to the government because of failure to do the work as he could resume operations and rely upon his original title by location at any time before another had located. Under these mere locations much of the valuable mining lands of the United States have been held and worked, and are still held and worked, and the title kept alive by the required work in each year has always been regarded as a perfectly safe and secure title. No provision has ever been enacted compelling any miner to patent his claim, and time and again these locations have been held to have all the effect and incidents of a grant from the government. As said by the supreme court of the United States in *Forbes* v. *Gracey,* 94 U. S. 767, [24 L. Ed. 313], 'Mining claims on public land are property in the fullest sense of the word.' In the case of *Gwillim* v. *Donnellan,* 115 U. S. 49, [5 Sup. Ct. 1112, 29 L. Ed. 348], the same court holds, 'A valid location of mineral lands made and kept up in accordance with statute has the effect of a grant by the United States of the right of present and exclusive possession of the lands located.' Mineral lands situated within the limits of railroad grants are subject to location up to the time of the issuance of the patent is clearly determined in the great case of *Barden* v. *N. P. R. R. Company,* 154 U. S. 288, [14 Sup. Ct. 1030, 38 L. Ed. 992], by the supreme court of the United States, and this court is the final arbiter of all the questions arising in cases like the one before this court, and this decision